STATE OF NEBRASKA, APPELLEE, V. TERRY HAVLAT, APPELLANT.
385 N.W.2d 436

Filed April 25, 1986.    No. 85-374.

Kirk E. Naylor, Jr., for appellant.

Robert M. Spire, Attorney General, and Terry R. Schaaf, for appellee.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

Defendant, Terry Havlat, appeals his conviction of manufacturing a controlled substance, marijuana. Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp. 1984). The marijuana was growing in a rural area when seized during a warrantless search. Havlat was sentenced to 20 to 40 months in the Nebraska Penal and Correctional Complex and fined $1,000.

On July 26, 1983, while Officers Roy Svoboda and Dean Heiden of the Nebraska State Patrol were making a low-level photographic investigative air flight over parts of Seward County, Nebraska, searching for unlawful growths of marijuana, they observed suspected marijuana plants on a

250-acre farm later determined to be owned by Lumir and Valerie Havlat, the defendant's parents. The farm was a grain and livestock operation of Lumir and defendant under an oral agreement having general terms that the defendant described as a partnership. The owners lived in the farmhouse. The property was fenced, with its gates closed and posted against trespassers.

On July 28 Officers Heiden and Billy Hobbs of the State Patrol entered the farm through a fence from a public road at a point distant from the farm buildings. They did not have a search warrant. The officers discovered four patches of growing marijuana, located more than one-quarter mile from the farm buildings, near a small creek that meandered through the farm. There was a heavy growth of trees, underbrush, and weeds on each side of the creek; the marijuana could not be seen from the road. A hay field and milo field were nearby.

The term "manufacture" includes cultivating marijuana. Neb. Rev. Stat. § 28-401(22) (Cum. Supp. 1984). The ground around the marijuana plants had been disturbed, and the weeds had been eradicated. Plastic garden-type hoses ran from the creek to the plants, conveying water pumped from the creek by a small, gasoline-powered pump from which the defendant's palm print was later taken and identified. Havlat testified that he had recently used the pump to clean out a cistern on the farm.

Patrol officers continued their investigation by succeeding warrantless intrusions on July 29 and August 2, 4, 5, and 8, 1983. In the late evening of August 8, the officers arrested Havlat when he appeared at the growing area. The following day, the officers seized 600 pounds of marijuana plants. A subsequent search of the defendant's home and garage in Milford, Nebraska, pursuant to a search warrant, produced two seed-starter trays, marijuana seeds, and other miscellaneous marijuana paraphernalia, not described since this evidence was later suppressed at the close of the trial.

On February 22, 1984, the trial court granted the defendant's pretrial motion to suppress evidence seized in the warrantless search. A single judge of this court reversed the order in the State's interlocutory appeal, as provided in Neb. Rev. Stat. § 29-824 (Cum. Supp. 1984). *State v. Havlat*, 217 Neb. 791, 351

N.W.2d 86 (1984). Later, the trial court, on its own motion, again suppressed the same evidence, and again that order was reversed in an interlocutory appeal. *State v. Havlat*, 218 Neb. 602, 357 N.W.2d 464 (1984).

Prior to trial, the State dismissed count II of the indictment charging Havlat with conspiracy to violate § 28-416(1)(a), and Havlat executed a written waiver of his right to a jury trial. At trial the evidence seized in the warrantless search was admitted over the defendant's objection. At the conclusion of the evidence, the trial judge made complete and detailed findings concerning the crime charged, the elements thereof, and the State's burden of proof. The trial court also made findings with regard to the testimony of witnesses which supported the State's burden of proof, the circumstantial nature of some of the evidence and its probative force, and the fact that the land was under the defendant's control. The court specifically noted that the suppressed evidence seized at the defendant's home pursuant to a search warrant was disregarded. The court then found Havlat guilty of cultivating marijuana in violation of § 28-416(1)(a).

In his first assignment of error, Havlat contends that the single judge of this court erred when he twice reversed the district court's orders suppressing the warrantless search evidence and that the trial court erred when it admitted this evidence over the defendant's motion to suppress. Havlat claims that the evidence was seized in violation of state and federal constitutional provisions guaranteeing the right to be free from unreasonable searches and seizures. His argument is directed to the first-impression question of whether article I, § 7, of the Nebraska Constitution, guaranteeing the right to be free from unreasonable searches and seizures, should have a broader interpretation than its federal counterpart, the fourth amendment to the U.S. Constitution, when applying it to fact scenarios considered under the "open fields doctrine." Defendant urges a broad and separate state standard because Nebraska is an agrarian state dominated by large areas of farm and ranch land operations, the businesses within which should be accorded the same protection as those enclosed in buildings or walls.

The State counters that an open field is not an "effect" within the meaning of either the fourth amendment or article I, § 7, and even if it were, warrantless entries into open fields are still reasonable because no legitimate expectation of privacy exists in activities conducted in the open fields. What is "reasonable," the State posits, is to be measured not by the subjective expectations of the parties but by an objective test of what society considers a legitimate interest in privacy which warrants constitutional protection. The State also argues that the officers' actions were proper pursuant to Neb. Rev. Stat. § 28-429(1)(d) (Reissue 1979), which specifically permits law enforcement officers to enter onto property without a search warrant or consent for the purpose of locating and eradicating wild or illicit weeds from which a controlled substance could be extracted.

The U.S. Supreme Court first articulated the open fields doctrine in *Hester v. United States*, 265 U.S. 57, 59, 44 S. Ct. 445, 68 L. Ed. 898 (1924): "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields." Forty-three years later, in a telephone-booth electronic surveillance case, the same Court declared that the "Fourth Amendment protects *people, not places*." (Emphasis supplied.) *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

Recently, the U.S. Supreme Court reaffirmed the *Hester* open fields doctrine in *Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). The facts in *Oliver*, except for the successive intrusions, were similar to the facts before us, including the warrantless trespass in a rural area enclosed by a fence and posted with no-trespassing signs. The *Oliver* Court held that, since *Katz*, the touchstone of fourth amendment analysis has been the question of whether a person has a constitutionally protected, reasonable expectation of privacy. This is not merely a *subjective* expectation of privacy but, rather, includes only those expectations that society is prepared to recognize as reasonable—in other words, an objective test of reasonableness. Based on this premise, the *Oliver* Court concluded that the open fields doctrine of *Hester*

retained its validity and was consistent with the holding in *Katz*. Further,

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant. [Citation omitted.] In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment [citation omitted], the uses to which the individual has put a location [citation omitted], and our societal understanding that certain areas deserve the most scrupulous protection from government invasion [citation omitted]. These factors are equally relevant to determining whether the government's intrusion upon open fields without a warrant or probable cause violates reasonable expectations of privacy and is therefore a search proscribed by the Amendment.
>
> . . . .
>
> . . . [O]pen fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or "No Trespassing" signs effectively bar the public from viewing open fields in rural areas. . . . For these reasons, the asserted expectation of privacy in open fields is not an expectation that "society recognizes as reasonable."

466 U.S. at 177-79.

While concluding that neither probable cause nor a warrant is required to effect police searches of open fields, the Court emphasized that the fourth amendment continues to protect other activities in the open fields which might involve an individual's privacy.

Although a state may not impose greater restrictions on

police activity as a matter of *federal* constitutional law, a state may impose higher standards governing police practices on the basis of *state* law. See, *Oregon v. Hass*, 420 U.S. 714, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975); *Cooper v. California*, 386 U.S. 58, 87 S. Ct. 788, 17 L. Ed. 2d 730 (1967), *reh'g denied* 386 U.S. 988, 87 S. Ct. 1283, 18 L. Ed. 2d 243.

This court has not previously addressed the specific question of whether article I, § 7, of the Nebraska Constitution, which is phrased identically to the fourth amendment, affords greater protection against governmental searches and seizures involving open fields than does its federal counterpart.

Our decision in *State v. Cemper*, 209 Neb. 376, 307 N.W.2d 820 (1981), based on the fourth amendment to the federal Constitution, merely anticipated *Oliver*. Cemper, an employee of a farm lessee, was convicted of manufacturing marijuana. We held that although under *Katz* the right to claim the protection of the fourth amendment depended upon whether a person had a legitimate expectation of privacy in the invaded place, nevertheless the open fields doctrine of *Hester* remained applicable. Evidence of ownership or possessory rights (or in *Cemper*, the lack thereof) was a factor in determining the legitimate expectation of privacy. Further,

> In the rural areas of this state it would be difficult to find a landowner who would believe that no person would enter on his open field without permission. Hunters, fishermen, and other technical trespassers are so commonly expected in the rural areas of this state that a failure to post trespassing signs is regarded by many persons as almost an implied permission to enter.

*Cemper, supra* at 381-82, 307 N.W.2d at 823.

Applying *Cemper* to the Nebraska Constitution, we hold that a person's capacity to claim the protection of article I, § 7, of the Nebraska Constitution as to unreasonable searches and seizures, like its counterpart, the fourth amendment to the U.S. Constitution, depends upon whether the person who claims such protection has a legitimate expectation of privacy in the invaded place. Further, the open fields doctrine of *Hester v. United States*, 265 U.S. 57, 44 S. Ct. 445, 68 L. Ed. 898 (1924), is applicable under our Constitution.

Nowhere in our independent research of the state constitutional conventions do we find evidence that the framers intended the explicit language of article I, § 7, to encompass more than what it says. See, 2 Proc. Const. Conv. 1871, 93-96; 1 Proc. Const. Conv. 1871, 88-90.

There is no merit in the argument that Nebraska's agrarian economy requires a broader interpretation of article I, § 7, of the state Constitution. To the contrary, we note that a vast majority of the 50 states, regardless of population, have large areas of land devoted to farming, ranching, mining, and tree production.

Concerning the open fields doctrine, our state Constitution does not afford more protection than does the fourth amendment to the federal Constitution as interpreted in *Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984), and we decline to judicially impose higher standards governing law enforcement officers under the provisions of the state Constitution. Without a further recitation of the rationale set forth by the majority in *Oliver*, we find persuasive the reasons advanced in *Oliver* for concluding that no constitutional protection attaches to Havlat's activities occurring in the open fields, that Havlat had no legitimate expectation of privacy under the facts here, and that police could enter and search the open field without probable cause or a search warrant.

Accordingly, Havlat's first assignment of error is without merit. The trial court did not err when it admitted evidence at trial seized during a warrantless search of Havlat's property, and the single judge who ruled on the State's interlocutory motions was correct in reversing the trial court's order suppressing the evidence.

As Havlat's second assignment of error, he claims that the trial court erred in deciding Havlat's guilt on the basis of testimonial evidence of one Kenneth Witmuss, Jr. Havlat claims that this evidence, admitted at trial, was wholly lacking in relevance and probative value due to the State's failure to lay adequate foundation. The defendant and Witmuss had been friendly for several years prior to 1983. Witmuss had visited Havlat at his home and at the farm, the pair had traveled

together to California, and from 1979 to 1982 Witmuss had been a part-time mechanic employed by the defendant.

It is undisputed that Witmuss' testimony is circumstantial. " 'Circumstantial evidence is defined as the attendant facts and circumstances from which a principal fact may be inferred by the usual processes of reasoning. . . .' " *State v. Betts*, 210 Neb. 348, 350, 314 N.W.2d 257, 258 (1982).

Because of the wide variety of facts that may have circumstantial probative value, courts are liberal in admitting such evidence of facts which appear to have some degree of relevance to the matters in issue. Much discretion is left to the trial judge, and his or her rulings will be sustained if the evidence admitted tends to show that a fact in controversy did or did not exist. See, 1 C. Torcia, Wharton's Criminal Evidence § 155 (13th ed. 1972); 29 Am. Jur. 2d *Evidence* § 266 (1967). Further, the trial judge has wide discretion in the determination of foundation, that is, connecting or qualifying evidence, and "[i]n order to be admissible, evidence need not invariably appear to be relevant at the time when it is proffered." 1 S. Gard, Jones on Evidence §§ 4:59 and 4:60 at 512 (6th ed. 1972).

When a case is tried to the court without a jury, it is presumed that the trial court considered only competent and relevant evidence in reaching its decision. *State v. Tomes*, 218 Neb. 148, 352 N.W.2d 608 (1984). This court will not reverse a trial court's decision when there is otherwise sufficient material, competent, and relevant evidence to sustain the judgment. *Id.*

The long-standing rule in this state is that in determining the sufficiency of the evidence to sustain a conviction in a criminal prosecution, this court does not resolve conflicts in the evidence, pass upon the credibility of the witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact, and its verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. True*, 210 Neb. 701, 316 N.W.2d 623 (1982); *State v. Thaden*, 210 Neb. 622, 316 N.W.2d 317 (1982); *State v. Meadows*, 203 Neb. 197, 277 N.W.2d 707 (1979).

Havlat claims that the trial court erred when it admitted certain testimony of Witmuss over objections of foundation,

relevancy, and lack of probative value. Witmuss testified that on one occasion in 1983 the defendant gave him marijuana which he, Havlat, took from a grain sack in the garage on the farm. From the known relationship of Witmuss and Havlat, the general nature of the testimony, and other evidence in the record, it was within the discretion of the trial judge to admit the evidence on the expectation of later connecting foundation. Such was not provided. Witmuss subsequently testified, without objection, that the defendant had once mentioned the growing of marijuana. Defendant did object to further similar testimony, and although the objection was overruled, that line of questioning ended. However, succeeding foundation evidence established that the conversation was remote in time, having occurred sometime prior to 1981. In each of these instances where either the connecting evidence was not provided or other evidence destroyed the relevancy of the evidence, such was subject to being stricken. Havlat made no motion to strike. In any event, there was no error, because Havlat himself later testified that he had given marijuana to Witmuss. No substantial right of the defendant was affected, and it is presumed that the trial judge disregarded the evidence.

Havlat's main concern relates to Witmuss' testifying over objection that in the winter prior to defendant's arrest, he and the defendant had talked about irrigation systems. Witmuss stated that Havlat expressed an interest in installing a drip irrigation system on his farm, but Havlat did not say that he planned to use it for watering marijuana. The time, place, and circumstances surrounding this conversation were sufficiently provided. As the trial court found, the testimony provided a thread of circumstantial evidence having probative value relating to the issue of cultivating marijuana. There was no error in admitting this evidence; its weight and credibility were for the trier of fact.

Havlat also claims in his second assignment of error that the trial court committed prejudicial error because it decided Havlat's guilt on the basis of Witmuss' testimony relating to irrigation systems. This assertion is contrary to the record. The trial judge's findings noted the testimony, but only as a circumstance supporting other evidence that the defendant was

cultivating marijuana plants. The other evidence included the observations of the investigating officers; the soil around the plants, which was disturbed and damp; the hoses and pump, which were in place and operable; the defendant's palm print on the pump; and the fact that the defendant controlled the area where the plants were growing. Even disregarding Witmuss' testimony, ample probative evidence existed to support the defendant's conviction.

We will not interfere with a guilty verdict based upon evidence in a criminal case unless the evidence is so lacking in probative force that it can be said as a matter of law that the evidence is insufficient to support a guilty verdict beyond a reasonable doubt. *State v. Thaden*, 210 Neb. 622, 316 N.W.2d 317 (1982). Here, the record discloses sufficient evidence which supports a rational theory of the defendant's guilt. Havlat's second assignment of error is therefore without merit.

For these reasons the judgment of the district court is in all respects affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the majority in this case. I do so because I believe that the facts of this case do not justify our saying that the defendant's right to be free of unreasonable searches and seizures under either the fourth amendment to the U.S. Constitution or Neb. Const. art. I, § 7, was not violated. I am persuaded in part by the dissent of Justice Marshall in *Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984), the case relied upon in part by the majority in this case. In his dissent in *Oliver*, Justice Marshall notes at 185-86:

> The first ground on which the Court rests its decision is that the Fourth Amendment "indicates with some precision the places and things encompassed by its protections," and that real property is not included in the list of protected spaces and possessions. *Ante*, at 176. This line of argument has several flaws. Most obviously, it is inconsistent with the results of many of our previous decisions, none of which the Court purports to overrule. For example, neither a public telephone booth nor a conversation conducted therein can fairly be described as

a person, house, paper, or effect; yet we have held that the Fourth Amendment forbids the police without a warrant to eavesdrop on such a conversation. *Katz v. United States*, 389 U. S. 347 (1967). Nor can it plausibly be argued that an office or commercial establishment is covered by the plain language of the Amendment; yet we have held that such premises are entitled to constitutional protection if they are marked in a fashion that alerts the public to the fact that they are private. *Marshall v. Barlow's, Inc.*, 436 U. S. 307, 311 (1978); *G. M. Leasing Corp. v. United States*, 429 U. S. 338, 358-359 (1977).

It is difficult for me to perceive how we can, on the one hand, write out open fields surrounded by a locked fence and posted signs reading "No Trespass," and, on the other, read in public telephone booths and commercial places of business.

While the majority in *Oliver v. United States, supra* at 179, concludes that "open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance," *Oliver*, nevertheless, teaches us:

No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant. [Citation omitted.] In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment [citation omitted], the uses to which the individual has put a location [citation omitted], and our societal understanding that certain areas deserve the most scrupulous protection from government invasion [citation omitted]. These factors are equally relevant to determining whether the government's intrusion upon open fields without a warrant or probable cause violates reasonable expectations of privacy and is therefore a search proscribed by the Amendment.

*Id.* at 177-78.

As the majority in this case has done, I too would look to this court's earlier decision in *State v. Cemper*, 209 Neb. 376, 307

N.W.2d 820 (1981). I would not reach the same conclusion, however, regarding the holding of *Cemper*. In my view *Cemper* has not written out the open field from the protection of either the fourth amendment to the U.S. Constitution or Neb. Const. art. I, § 7. Rather, *State v. Cemper, supra* at 382, 307 N.W.2d at 823, indicates:

> The fourth amendment protects persons but it does not protect them in every circumstance and in every place, public or private. Ownership and possessory rights in "places" are still important in determining whether or not a particular person has a legitimate expectation of privacy in a particular place. The open fields doctrine is not completely dead. Its reincarnated substance is still a vital part of the broader constitutional concept of freedom from unreasonable searches and seizures.

Having said that, we then went on in *Cemper* to conclude that, under the circumstances in *Cemper*, the defendant could not have a legitimate expectation of privacy in *his particular* open field. The facts in *Cemper*, however, were that while there was a fence surrounding the area, there were unlocked, open gates and no signs posted. That is not the evidence presented to us in this case. Here, the evidence is that the officers had to crawl through a perimeter fence in order to get into the field. To suggest that a person who has placed a locked fence around a field and posted the fence with no trespassing signs has no expectation of privacy is to simply ignore the facts of the matter. I am simply not prepared to hold that under the provisions of Neb. Const. art. I, § 7, no one in Nebraska may have an expectation of privacy in an open field which is tightly fenced, locked, and signed against trespassers. I cannot imagine what more a person could do to evidence an expectation of privacy.

In my view, under the Nebraska Constitution, before a court can determine whether a citizen's right to privacy has been violated, a court must examine the facts to determine whether a person challenging a search or seizure has standing, i.e., a reasonable expectation of privacy. After having concluded that Havlat has shown that he had a reasonable expectation of privacy, I would then examine the facts and conclude that the search in the instant case was unreasonable and, thus, Havlat's

rights were violated. Neither the fourth amendment to the federal Constitution nor Neb. Const. art. I, § 7, bars all searches and seizures; they merely bar unreasonable searches and seizures. The most common and the most reliable method of showing that a search was reasonable is by proving at trial that a search warrant had properly been procured before the search. Thus, "a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable unless the police can show that it falls within one of the carefully designated exceptions based on the presence of 'exigent circumstances.' " *State v. Weible*, 211 Neb. 174, 179, 317 N.W.2d 920, 923 (1982).

In the present case the evidence discloses that the officers flew over the area and took photographs. When the photographs were developed, the officers testified, they "felt that [the depicted vegetation near the haystack] was marijuana." There is nothing in the record to indicate that with that information the officers could not have obtained a warrant to search the area; there were no exigent circumstances shown here. By requiring officers to first obtain a warrant before intruding into a citizen's privacy, the Constitutions of both the United States and the State of Nebraska contemplate that some impartial arbitrator in the form of a magistrate will be afforded an opportunity to determine whether there is a reasonable basis for invading a citizen's otherwise protected privacy. By not doing so in this case, the State conducted an unreasonable search, in violation of both federal and state Constitutions.

While it is apparent that we must do all we can to combat the ever-growing problem created by drugs within our society, I am nevertheless reminded of the words of Sir Thomas More, who, after being told by Roper that he would cut down every law in England to get after the Devil, said, "And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat?"

SHANAHAN, J., dissenting.

The majority has provided an investigative field day for law enforcement searches without a warrant.

The Havlat farm, where Terry Havlat's parents resided, lies

in parts of adjacent sections, Section 3 on the east and Section 4 on the west, with the farmstead in the northern part of Section 4. Farming operations, conducted by Terry Havlat in partnership with his father since 1977, included crops, hay production, and cattle operations. South of the farmstead, in the southeast quarter of Section 4, was a milo field. East of the farmstead was an alfalfa field, in the northwest quarter of Section 3, and pasture located in the southwest quarter of that same section. Woods and a creek, separating the alfalfa field from the pasture, ran east along the quarter section line to a north-south county road at the east side of the Havlat farm. The farm had perimeter fences and several "no trespassing" signs conspicuously posted. The wooded creek area provided shelter for cattle and calving operations in winter.

On the morning of July 26, 1983, for Trooper Heiden, an investigator in the division of drug control of the Nebraska State Patrol, there were "arrangements made to do some aerial flying of places where the possibility existed of being marijuana fields." That morning, from a State Patrol aircraft at an altitude between 500 and 700 feet, Heiden took several photographs of the Havlat farm and especially focused on the wooded creek area southeast of the farmstead. While photographing and aerially viewing the area without binoculars, Heiden noticed "green vegetation" growing around a haystack located in the southwest corner of the alfalfa field, near the west boundary of Section 3.

When the aerial photographs were developed and examined by him on July 27, Heiden "felt that [the depicted vegetation near the haystack] was marijuana." On July 28 Heiden, and another patrol investigator who saw the aerial photographs, decided "to hike into the area in question and check out the photographs" and to "determine whether, if those plants were marijuana, whether they were volunteer or planted." The two investigators drove to the east side of the Havlat farm, parked their car on the county road, observed a "no trespassing" sign, without Havlat permission crawled through a perimeter fence, and started their trek westward in the woods, with their destination being the haystack area a quarter mile away and not visible from the road. After walking west "close to a half a

mile," the investigators arrived at the haystack depicted in the aerial photographs. There is no explanation given for the troopers' walking a "half a mile" in the woods to reach the haystack area located a quarter mile from the road—a site fixed with precision in the aerial photographs. Notwithstanding their somewhat nomadic approach, the investigators finally arrived at the haystack and verified that the vegetation, observed by Heiden on July 26, was cultivated marijuana. The State Patrol obtained additional aerial photographs on July 29, and that same day three patrol investigators, again without Havlat permission, entered the farm from the county road on the east, walked to the haystack, and then, for an "hour or two," searched for marijuana growing outside the immediate vicinity of the haystack.

On August 2 investigators of the State Patrol entered the Havlat farm for the third time, without permission, and set up a "surveillance camera" near the haystack. Investigators, still without Havlat permission, entered the premises on August 4 for the fourth time and changed film in the surveillance camera, which was finally removed by patrol investigators on August 5 during the fifth entry without permission. On August 8 Heiden and another investigator, lacking permission from Havlat, entered the farm again to set up personal surveillance, perhaps to catch Terry Havlat green-handed. The troopers carried their surveillance equipment, which included a sawed-off shotgun. Near the haystack, one trooper placed the shotgun under a tree, and the troopers momentarily left their equipment to reconnoiter and photograph the area. When they returned to the location of their equipment, the troopers observed "[a] subject sitting with our equipment, with a dog holding a shotgun that belonged" to one of the troopers. Perhaps Havlat, accompanied by his dog, was holding the shotgun. In any event, one of the troopers directed Terry Havlat to "put the shotgun down." Havlat complied, supplied his identification to the troopers, and was arrested. The troopers later removed marijuana plants for evidence. Based on an affidavit containing information obtained through the various nonconsensual entries between July 28 and August 8, the county court, on August 9, issued a warrant to search Terry

Havlat's town residence, and on September 21 issued a search warrant pertaining to the wooded creek area of the Havlat farm.

Skeptics might say that the itinerant investigators, in walking a half mile to reach the haystack pinpointed by aerial photographs at a location 1,320 feet west of the county road, were on a general, investigatory expedition rather than a realistic route to the haystack. Others might surmise that, given additional time and the intensity of persistent pedestrian traffic by law enforcement on the Havlat farm, the entire question about the search would become moot on account of the investigators' prescriptive right-of-way acquired on the premises. However, the question concerning admissibility of the evidence obtained by the investigators is not moot and must be addressed.

As expressed by the U.S. Supreme Court in *Katz v. United States*, 389 U.S. 347, 350-51, 353, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967):

> [T]he correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase "constitutionally protected area." . . . [An] effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. . . .
>
> . . . .
>
> . . . [A]nd once it is recognized that the Fourth Amendment protects people—and not simply "areas"—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.

Concurring in *Katz*, Justice Harlan stated: "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Id.* at 361.

The majority of this court has greatly emphasized and adopted the view expressed in *Oliver v. United States*, 466 U.S.

170, 179, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984): Because open fields "are accessible to the public and the police in ways that a home, an office, or commercial structure would not be . . . the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.' "

In *Oliver* the U.S. Supreme Court also observed: "It is clear, however, that the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage." 466 U.S. at 180 n.11. This leads to the constitutional converse that the phrase "open fields" may not include any occupied or developed area outside the curtilage.

The more plausible test in determining whether a particular site is a constitutionally protected area is found in the two-part test suggested by Justice Harlan in *Katz v. United States, supra*: (1) Has the person exhibited a reasonable expectation of privacy? If the preceding is answered in the affirmative, (2) Has such expectation of privacy been violated by unreasonable governmental intrusion? Such two-part test has been adopted by state courts answering questions about law enforcement's search and seizure of citizens. See, *State v. Brady*, 406 So. 2d 1093 (Fla. 1981); *People v. Edwards*, 71 Cal. 2d 1096, 458 P.2d 713, 80 Cal. Rptr. 633 (1969); *State v. Byers*, 359 So. 2d 84 (La. 1978).

In its attempt at an upright position, the majority opinion leans on *State v. Cemper*, 209 Neb. 376, 307 N.W.2d 820 (1981), adopted by two judges of this court, with the remaining five judges concurring in the result. In *Cemper* the real estate involved was not posted, was accessible through at least one fence-gate which was never closed, and was land "owned by one company, of which [Cemper] was an employee, and farmed by another company, with which [Cemper] had no connection, in a rural area and on land on which no one resided." 209 Neb. at 381, 307 N.W.2d at 823. Even seeking strained similarities, one is compelled to conclude there is a drastic difference between the facts in *Cemper* and the present case. The statement in *State v. Cemper, supra* at 382, 307 N.W.2d at 823, "Hunters, fishermen, and other technical trespassers are so commonly expected in the rural areas of this state that a failure to post trespassing signs is regarded by many persons as almost an

implied permission to enter," is quixotic, a questionable concept for constitutional law, and an inaccurate characterization of the situation encountered by one without consent hunting and emerging from a field of cornstalks to find a scowling landowner who does not view the interloper as a recreational licensee.

In the present case the Havlat land was entirely fenced private property, accessible only with consent or by trespass, was conspicuously posted with "no trespassing" signs, and constituted an occupied and developed farm unit. Short of constructing some opaque and impenetrable structure around the farm, it is difficult to envision what other measures could have been reasonably utilized to assert and preserve the right of privacy on the Havlat land. Havlat demonstrated a subjective expectation of privacy protectable against unreasonable government intrusion. Acquisition of physical evidence in the present case is the result of an invasion upon and violation of Havlat's reasonable expectation of privacy, an unreasonable search, and should have been excluded.

There is, however, an additional reason for excluding the physical evidence in the present case. Although the majority euphemistically calls the officers' entries "warrantless intrusions," the investigators' six entries were, nonetheless, trespasses.

> A person commits second degree criminal trespass if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by:
>
> (a) Actual communication to the actor; or
>
> (b) Posting in a manner prescribed by law or reasonably likely to come to the attention of intruders; or
>
> (c) Fencing or other enclosure manifestly designed to exclude intruders.

Neb. Rev. Stat. § 28-521(1) (Reissue 1979).

Conviction for violation of the foregoing criminal statute is punishable by imprisonment, a fine, or both imprisonment and fine. Neb. Rev. Stat. § 28-106(1) (Cum. Supp. 1984).

In construing the Nebraska Constitution, art. I, § 7, "The right of the people to be secure in their persons, houses, papers,

and effects against unreasonable searches and seizures shall not be violated," we should not unquestioningly follow an analysis tendered by the U.S. Supreme Court regarding its construction of the fourth amendment to the U.S. Constitution. As the majority recognizes, this court is not inextricably bound to federal decisions which provide less restriction on searches and seizures than may be appropriate for the citizens of Nebraska. We still have the capacity, as well as the obligation, to exercise independence in determining any exclusionary rule regarding admission of evidence questioned under the provisions of the Nebraska Constitution. When called upon to construe the Nebraska Constitution, this court should not exhibit some pavlovian conditioned reflex in an uncritical adoption of federal decisions as the construction to be placed on provisions of the Nebraska Constitution analogous to the U.S. Constitution's.

The conduct of law enforcement, in obtaining physical evidence in this case, involved repeated trespasses and, therefore, violations of the criminal code of Nebraska. A judicial rule for exclusion of evidence tainted by violation of the criminal code would undoubtedly deter future illegal conduct by law enforcement in investigations or gathering evidence. As a more fundamental consideration, by allowing admission of evidence obtained through law enforcement's illegal activity, courts encourage continued violation of law as a method of obtaining evidence to convict an accused, and "no distinction can be taken between the Government as prosecutor and the Government as judge." *Olmstead v. United States,* 277 U.S. 438, 470, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Holmes, J., dissenting). At that point the imperative of judicial integrity evaporates. As expressed by Justice Brandeis, also dissenting in *Olmstead v. United States, supra* at 485: "To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face." When law enforcement has contempt for laws of the people, inevitably people will have contempt for enforcement of laws.

574

Professor George E. Dix has pointed out:

> If state courts are to fulfill their responsibility as state tribunals, it will be necessary that they acknowledge state law issues as ones requiring independent analysis. Supreme Court analyses and results are, of course, available as potential models. In view of the nature of the issues presented by state law exclusionary sanction claims, however, state courts are obligated to exercise great care before deferring to these models.

Dix, *Exclusionary Rule Issues as Matters of State Law*, 11 Am. J. Crim. L. 109, 148 (1983).

If this court views the rights of Nebraska's citizens only in the light of some federal and less protective decisions, then, truly, we will see such rights "through a glass, darkly."