STATE OF NEBRASKA, APPELLEE, V. LARRY J. HINTON, APPELLANT.
415 N.W.2d 138

Filed November 6, 1987.    No. 87-123.

Thomas M. Kenney, Douglas County Public Defender, and Cathy K. Bashner, for appellant.

Robert M. Spire, Attorney General, and Lynne Fritz, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

Following a bench trial, defendant, Larry J. Hinton, was adjudged guilty of possessing cocaine, a controlled substance, with the intent to deliver same, in violation of Neb. Rev. Stat. § 28-416(1)(a) (Reissue 1985). The district court subsequently determined that the offense constituted a Class II felony under the provisions of § 28-416(2) and Neb. Rev. Stat. § 28-405 (Reissue 1985), and sentenced Hinton to imprisonment for a period of 10 to 15 years. Hinton appeals and assigns as errors the district court's failure to suppress the evidence obtained as the result of (1) attaching a pen register on his residence telephone, (2) intercepting his telephone communications, (3) searching a package found in his vehicle, and (4) searching his residence. We affirm.

## FACTS

Based on information derived from a narcotics purchase made by an undercover police officer, and corroborating information received from a confidential source, officers of the Omaha Police Division, on September 20, 1985, filed a combined application and affidavit in the county court for Douglas County seeking a search warrant which would permit the installation of a pen register on the telephone serving Hinton's residence. A pen register is a device which prints the numbers dialed from the telephone line on which it is installed, and further reflects that incoming calls were received, but does not reveal the sources of the incoming calls. The requested warrant was issued as ordered by the county court on September 20, 1985, and a pen register installed on September 23, 1985. This pen register warrant was returned within 10 days of its issuance. The application did not seek to limit the time within which the pen register might be used, and the warrant imposed no such time limit.

The pen register recorded the telephone numbers called from Hinton's residence from the day it was installed until Hinton's arrest on March 21, 1986, a total of almost 6 months. No amended search warrant covering use of this pen register was requested or issued when Hinton changed his home telephone number on or about February 24, 1986; the register simply continued to operate on the new number.

On February 5, 1986, based in part upon information gathered from the pen register and in larger part upon extensive additional investigation, the Douglas County attorney filed a 37-page combined application and affidavit in the district court for Douglas County, seeking permission to intercept conversations conducted over Hinton's residence telephone which would reveal, according to paragraph 62 of the aforesaid document, the following information concerning the illegal distribution of controlled substances:

A. The identity of individuals as yet unknown who are involved in these offenses and the extent of their involvement.

B. The details of carrying out the offenses listed below:

1. The times when these illegal transactions will occur or have occurred.

2. The location of specific illegal narcotics.

3. The identity of the source or sources of supply of the illegal narcotics and the extent of the source(s) [sic] involvement.

4. The manner in which monies derived from the illegal narcotics transactions were utilized, concealed, "laundered", or otherwise disposed.

5. The arrangement and verification of meetings between individuals involved in the aforementioned offenses.

The district court, finding that "normal police investigative methods have been attempted and failed and reasonably appear [likely] to fail to succeed in the future," granted the application on February 19, 1986, and ordered

intercept[ion of] the wire or oral communications of Larry Hinton . . . over [Hinton's then residence telephone number] . . . for a period of thirty (30) days from the date of the actual physical hook-up, and shall not automatically terminate when the described communications have first been obtained, but will terminate upon attainment of the authorized objectives as outlined in paragraph 62 of the application and affidavit.

The court further ordered "interim reports every ten (10) days from the date of the actual physical hook-up, setting forth the

number of calls intercepted . . . and the nature of the calls."

Hinton's telephone was tapped, pursuant to this order, on February 19, 1986. Conversations monitored on February 20 and 21, 1986, revealed, among other things, that Hinton intended to change his telephone number; consequently, the county attorney filed an amended combined application and affidavit with the district court. This document repeated the assertions of the first application and affidavit in that court, added assertions informing the district court of the pending change in Hinton's telephone number, and requested authorization to intercept conversations carried over the new number. The district court, again finding that "normal police investigative methods have been attempted and failed and reasonably appear [likely] to fail to succeed in the future," granted the relief sought in the amended application on February 24, 1986, and authorized the interception of conversations over Hinton's new telephone number for 25 days, again ordering the filing of interim reports every 10 days while the tap continued.

Conversations monitored pursuant to these two wiretap orders suggested that Hinton was using his telephone to arrange the shipment of substantial amounts of cocaine via a commercial package carrier from a New York address to the Omaha area, and was paying for the cocaine by shipping cash to New York via the same carrier. On March 3, 1986, the police officers monitoring the conversations overheard Hinton tell his suspected New York cocaine source that Hinton would ship out a quantity of money the following day. On this basis the officers, on March 4, 1986, requested a warrant to search a package Hinton had delivered to the carrier for shipment. An order of the county court granting this money shipment search warrant was issued on March 4. The package was searched pursuant to this warrant at the carrier's Omaha terminal on March 4 and found to contain $22,500. The package was then resealed and allowed to continue on to its destination in New York. The county court had ordered return of this money shipment search warrant within 10 days of issuance; however, it was not returned until May 30, 1986, more than 12 weeks after issuance.

Subsequently, another telephone call between Hinton and the suspected New York source was monitored by the police on March 14, 1986; this conversation also indicated that Hinton would be shipping a quantity of cash to the suspected source, via the carrier, in prepayment for a drug shipment. A search warrant for this second shipment of money was requested from the county court, and an order granting the request was issued on March 14, 1986. This second money shipment search warrant was executed the same day it was issued, and the package was searched at the carrier's Omaha terminal. It was found to contain $19,000. The package was then resealed and allowed to continue on to its destination in New York. The county court ordered return of the second money shipment search warrant within 10 days of issuance; however, it was not returned until May 30, 1986, 11 weeks after issuance.

On March 14, 1986, the monitored conversation revealed that Hinton's suspected New York source intended to personally deliver Hinton a supply of cocaine a few days later. However, on March 17 the police intercepted a telephone conversation in which Hinton's live-in girlfriend warned this suspected source to delay the trip. On the basis of this information and the results of surreptitious observation of Hinton, the county attorney, on March 20, 1986, requested from the district court an extension of the authorization to tap Hinton's new telephone number, and that the order of extension, should one issue, require "interim reports every ten (10) days from [March 20, 1986]."

The district court, finding that the objectives of the initial and amended applications and orders were yet to be fully met and that "normal police investigative methods have been attempted and failed, and reasonably appear [likely] to fail to succeed in the future," granted the extension on March 20, 1986, to continue the tap on Hinton's new telephone number for 30 days from the date of issuance, and ordered the county attorney to file interim reports every 10 days through that period.

On March 20, 1986, officers monitoring the telephone overheard a conversation between Hinton and his suspected source to the effect that three packages had been shipped to

Hinton via the carrier and should arrive shortly. The following day, March 21, 1986, the police verified that a package addressed to Hinton from one of the New York addresses used by the suspected source had arrived at the carrier's Omaha terminal. At approximately 9:30 that morning, officers monitoring Hinton's telephone conversations overheard him call the carrier's Omaha terminal, verify the arrival of the package, and inquire if one John Gallion, a known Hinton confederate, might pick up the package on Hinton's behalf; the carrier's officials assured Hinton this would be acceptable.

Shortly thereafter, the police and agents of the Federal Bureau of Investigation saw Hinton and Gallion leave Hinton's apartment, enter Gallion's automobile, and drive to the carrier's terminal. The officers then observed Gallion enter the carrier's terminal while Hinton remained in the automobile. Gallion returned to the automobile 2 to 3 minutes later, carrying a package measuring approximately 18 inches by 12 inches by 3 inches. Hinton and Gallion then drove off. Although they had no arrest warrant, the police and FBI agents followed and placed both Hinton and Gallion under arrest.

At this time a police officer "reached in . . . through the open driver's door and took the package from between the front seats." The officer carried the package to the Omaha Police Division Central Station, keeping it in his possession until a combined application and affidavit for a search warrant and the warrant were prepared, issued, and executed, all of which occurred during the day of Hinton's arrest. The county court ordered return of this automobile package search warrant within 10 days of its issuance; the warrant was instead returned to the county court on May 29, 1986, nearly 10 weeks after issuance. Field tests indicated that the package contained narcotic substances. Subsequent laboratory analysis determined the package contained $2^{1}/_{4}$ pounds of 99-percent-pure cocaine.

On the day of Hinton's arrest the police also filed a combined application and affidavit with the county court for a warrant to search Hinton's residence. This document recited information gleaned from the pen register, wiretaps, searches of the two packages of money Hinton had shipped to New York, the

surreptitious observation of Hinton, and confidential informants, all tending to support the affiant's stated belief that if a no-knock search of Hinton's residence was conducted, evidence of illegal drug transactions would be found. This application was granted by the county court on the day sought, and the warrant was issued and executed on that same day. The search conducted pursuant to this residence search warrant produced several dozen items of drug paraphernalia contaminated with a white powder residue suspected to have been cocaine. The results of the laboratory tests conducted on the residue are not reflected by the record. The county court ordered return of this residence search warrant within 10 days of its issuance; however, in typically slipshod fashion, this warrant was not returned until May 29, 1986, almost 10 weeks after its issuance.

On March 26, 1986, the district court, finding that the objectives of the wiretaps had been met and that the police had stopped intercepting telephone conversations as of 9:54 p.m. on March 21, 1986, ordered the existing wiretap terminated. Five months later, on August 20, 1986, the county attorney officially notified Hinton by letter of the placement of the taps. The letter was dated August 20 and postmarked August 22.

The prosecution failed to submit interim reports of the intercepted telephone conversations every 10 days, as had been ordered by the district court; in one instance an interim report apparently was submitted several days late, and a final interim report covering the period March 17, 1986, through the last intercepted call on March 21 was never filed. The record does contain three interim reports; one dated February 28, 1986 (covering the period February 19 through 24, 1986), one dated March 7, 1986 (covering the period February 24 through March 5, 1986), and one dated March 21, 1986 (covering the period March 6 through 16, 1986), respectively.

ANALYSIS

*Intercepted Communications Statutes*

We begin our analysis of the law applied to Hinton's assignments of error by reviewing the relevant provisions of Nebraska's intercepted communications statutes, Neb. Rev. Stat. §§ 86-701 through 86-712 (Reissue 1981 & Cum. Supp.

1986). In general, the statutes make it unlawful to, among other things, deliberately intercept or attempt to intercept, through any means, including through the use of any "electronic, mechanical, or other device," any wire or oral communications, unless the interceptor has previously obtained a court order permitting the interception or is a party to the communication, or one of the parties to the communication has previously consented to the interception. § 86-702 (Reissue 1981). The act permits prosecutors to apply to the district courts for authority to intercept wire or oral communications when such interception "may provide or has provided evidence" of, among other things, "dealing in narcotic or other dangerous drugs." § 86-703 (Reissue 1981).

Section 86-701(4) (Cum. Supp. 1986) defines electronic, mechanical, or other device as:

any device or apparatus which can be used to intercept a wire or oral communication other than (a) any telephone or telegraph instrument, equipment, or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his or her duties; or (b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal.

Other relevant definitions found in § 86-701 are:

(1) Wire communication shall mean any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of communications;

(2) Oral communication shall mean any oral communication uttered by a person exhibiting an expectation that such communication is not subject to

interception under circumstances justifying such expectation;

(3) Intercept shall mean the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

These definitions are virtually identical to those found in title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq. (1982). While this court has not treated these definition sections specifically, it has observed that § 86-705 (Reissue 1981), dealing with the requisites for obtaining authority to intercept wire or oral communications and with the contents of orders granting such authority, and 18 U.S.C. § 2518 " 'are, in all substantive ways and in wording, virtually identical. . . .' " *State v. DiMauro and Kessler*, 205 Neb. 275, 278, 287 N.W.2d 74, 76 (1980); *State v. Kolosseus*, 198 Neb. 404, 253 N.W.2d 157 (1977). Consequently, this court looks to federal law in interpreting the provisions of Nebraska's intercepted communications statutes. *State v. DiMauro and Kessler, supra; State v. Kolosseus, supra.*

### Pen Register

Recognizing that the U.S. Supreme Court has concluded that a search warrant is not required prior to installation of a pen register, *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S. Ct. 364, 54 L. Ed. 2d 376 (1977), and *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979), Hinton tells us that the "[w]arrantless use of a pen register violates State Constitutions" and refers us to *People v. Sporleder*, 666 P.2d 135 (Colo. 1983), and *Com. v. Beauford*, 327 Pa. Super. 253, 475 A.2d 783 (1984). Brief for Appellant at 3. However, Hinton does not tell us what specific language of the Nebraska Constitution he claims requires a search warrant before a pen register may be used. The general rule is that this court will not consider a constitutional challenge in the absence of a specification of the constitutional provision which is claimed to be violated. *State v. Burke*, 225 Neb. 625, 408 N.W.2d 239 (1987). This court will not hunt through a constitution in an effort to find language which might arguably support a challenger's position, conceive and develop the arguments which specific and identified constitutional

provisions may suggest, and then sit in judgment of the validity of those arguments.

Accordingly, we do not concern ourselves with the validity of the pen register search warrant, should such a warrant have been required.

### Interceptions

This then brings us to the second assignment of error, which claims that evidence of the intercepted telephone conversations should have been suppressed because the State lacked probable cause to tap Hinton's telephone, had not exhausted other investigative procedures, failed to make timely interim reports, and failed to provide a timely inventory of the interceptions.

### Probable Cause

An application for an order permitting the interception of telephone conversations serves a purpose similar to that served by an application for a search warrant, that is, to present information sufficient to enable a detached and neutral judicial officer to find that probable cause exists to issue an order or warrant. *United States v. Garcia,* 785 F.2d 214 (8th Cir. 1986), *cert. denied* 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342. The test for issuance of a wiretap warrant under 18 U.S.C. § 2518 is whether the sworn information before the court is of sufficient apparent reliability to justify a neutral judicial officer in finding that there is probable cause to believe that an offense has been or is being committed. *United States v. Abramson,* 553 F.2d 1164 (8th Cir. 1977), *cert. denied* 433 U.S. 911, 97 S. Ct. 2979, 53 L. Ed. 2d 1095. See, also, *United States v. Van Horn,* 579 F. Supp. 804 (D. Neb. 1984), *aff'd sub nom. United States v. Womochil,* 778 F.2d 1311 (8th Cir. 1985).

In the present case, the affidavit in support of the first wiretap application contained a 30-page factual recitation, derived through a 6-month investigation which employed confidential informants, surveillance of Hinton and his residence, controlled buys of narcotic substances by undercover officers, the use of the pen register, and examination of Hinton's telephone bills, all of which strongly indicated that Hinton was a significant supplier of cocaine to the Omaha area. Without reproducing that document in this opinion, the affidavit was sufficiently detailed and of sufficient apparent

reliability to warrant a finding by a neutral judge that there was probable cause to believe that an offense both had been and was being committed.

Other Investigative Procedures

Section 86-705(1) provides in part: "Each application shall include the following information: . . . (c) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

Hinton argues:

It is clear from the evidence introduced at the suppression hearing on August 25, 1986, that investigatory procedures employed by the Omaha Police Department and Douglas County Sheriff's Department had succeeded and, therefore, a wiretap order was not needed. The State's witnesses testified that they had sufficient grounds for issuing a search warrant for the apartment of Larry J. Hinton . . . prior to [the] February 19, 1986, wiretap order being issued. Since other investigatory procedures were successful the State has failed to comply with Neb. Rev. Stat. 86-705(C) (Reissue 1981).

Brief for Appellant at 12. Hinton's argument assumes that his arrest was the sole objective of the investigation of which these wiretap warrants were a part. However, as paragraph 62 of the State's applications for wiretaps clearly indicates, such was not the case. While it appears the police knew the identity of one of Hinton's sources, the police wanted to also learn, among other things, whether there were other sources, the extent of the involvement by others, and the manner in which Hinton used, concealed, "laundered," or otherwise disposed of the moneys produced by the illegal narcotics transactions in which he was thought to be engaged.

The record does not suggest that the police knew the answers to those additional questions, all of which were legitimate aspects of the investigation, at the time of the wiretap applications. Indeed, that these facts had not been determined after 6 months of increasingly intensive investigation of Hinton's affairs strongly supports the conclusion that

intercepting Hinton's telephone conversations was an appropriate step to take. Although investigators may not use wiretaps or eavesdropping devices as the first step in a narcotics investigation, neither must such devices be used only as a last resort; nor must an affidavit supporting a request for permission to wiretap and eavesdrop explain away all possible alternative techniques of investigation. *State v. Whitmore*, 221 Neb. 450, 378 N.W.2d 150 (1985); *State v. Golter*, 216 Neb. 36, 342 N.W.2d 650 (1983); *State v. Holmes and Beardslee*, 208 Neb. 114, 302 N.W.2d 382 (1981); *United States v. Garcia*, 785 F.2d 214 (8th Cir. 1986), *cert. denied* 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342.

Untimely Interim Reports

Section 86-705(7) provides:

> Whenever an order authorizing interception is entered pursuant to sections 86-701 to 86-707, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require.

The State, for reasons not disclosed by the record, chose to ignore the orders that it file reports at 10-day intervals, advising the district court of the number and nature of the calls intercepted. As noted earlier, no report was filed for the last 10 days the wiretap existed, and the reports for the remaining 26 days were late. Nonetheless, neither does the record reveal nor does Hinton claim that he was actually prejudiced by the State's failure to strictly comply with the reporting requirements of the wiretap orders. This jurisdiction is committed to the rule that substantial, not strict, compliance with the statutes governing interception of telephonic communications is required; that is, the interceptions must be conducted in such a manner as not to violate a party's substantive rights. *State v. Brennen*, 218 Neb. 454, 356 N.W.2d 861 (1984); *United States v. Wolk*, 466 F.2d 1143 (8th Cir. 1972). Moreover, as observed in *State v. Kohout*, 198 Neb. 90, 251 N.W.2d 723 (1977), since requiring interim reports is not mandated by statute and rests within the discretion of the judge issuing wiretap orders, waiver of the

requirement or determination of the consequences of failing to follow the order in that regard also rests within that judge's discretion.

## Untimely Inventory

The fact that substantial and not strict compliance with the relevant statutes is required disposes as well of Hinton's complaint that he was not, within 90 days after the termination order as required by § 86-705(9), provided an inventory of the order, the authorized periods of interception, and the fact that conversations were intercepted. As noted earlier, for reasons not disclosed by the record, no effort was made to comply with this order until 5 months after the interceptions were stopped.

The record does reflect, however, that an information was filed against Hinton on April 2, 1986, 12 days after his arrest; that he was arraigned and entered a plea of not guilty on April 10, 1986, on which date the court ordered mutual and reciprocal discovery pursuant to Neb. Rev. Stat. § 29-1912 (Reissue 1985); and that on July 14, 1986, Hinton filed numerous detailed motions to suppress evidence. As pointed out by the Attorney General, Hinton obviously had actual notice of the existence, as well as the substance, of the wiretaps before the 90-day statutory notice period expired. Under the circumstances Hinton suffered no prejudice by the State's failure to have strictly complied with the requirements of § 86-705(9).

### Searches

The remaining two assignments of error, the failure to suppress the evidence obtained as a result of the searches incident to the automobile package and residence warrants, are so interwoven that they are discussed together.

It must be noted at the outset that although these last two assignments of error address only the automobile package and residence warrants, Hinton's argument goes as well to the money shipment warrants of March 4 and 14, 1986.

Hinton first argues that there was no probable cause to issue any of those warrants. However, this argument is resolved adversely to Hinton by our earlier dispositions of his first two assignments of error; once it is determined that there was no infirmity in the use of the pen register or wiretaps, there was

more than sufficient probable cause to issue the warrants in question.

Hinton next contends that the evidence seized pursuant to all four of the warrants should be suppressed because they were not returned within 10 days after their respective dates. Again, however, we have said that in the absence of a clear showing of prejudice, the failure to comply strictly with postservice statutory requirements will not invalidate a search conducted pursuant to an otherwise valid warrant and, further, that a failure in the ministerial act of returning and filing a search warrant does not void the warrant. *State v. McCown*, 189 Neb. 495, 203 N.W.2d 445 (1973).

## DECISION

There being no merit to Hinton's assignments of error, the judgment of the district court is affirmed.

## CAVEAT

The application in this case of the principle that in the absence of demonstrated prejudice to a criminal defendant's substantive rights, substantial compliance with certain provisions of the intercepted communications statutes will suffice should not be read as a condonation by this court of the prosecutor's apparent indifference to the letter of the law. While limited and carefully controlled eavesdropping by government is regrettably necessary at this stage in our history, the practice is nonetheless a particularly rebarbative intrusion into the privacy that members of a free society are entitled to expect. It must be remembered that interceptions of suspected criminal telephone conversations result as well in at least some minimal interception of innocent conversations. Thus, simple professional pride should dictate scrupulous observance of the steps designed to protect the privacy of the citizens of this sovereign state. Additionally, it is inevitable that repeated lackadaisical prosecutory efforts, whether related to intercepted communications, return of warrants, or other aspects of criminal investigations, will in some future case prejudice a defendant's substantive rights and thereby succeed in destroying an otherwise valid conviction.

AFFIRMED.

SHANAHAN, J., dissenting.

With good reason, there is detectable uneasiness and, perhaps, apocalyptic apprehension in the majority's opinion. Since *State v. Brennen*, 218 Neb. 454, 356 N.W.2d 861 (1984), in which this court adopted the doctrine of "substantial compliance" to validate a wiretap despite police departure from requirements specified in wiretap statutes, the State has prevailed in every appeal to this court on the issue of police noncompliance with the statutory requirements for a wiretap—a batting average of 1.000, which would be an outstanding feat in the major leagues but is hardly a commendable indication of obedience to laws protecting the privacy of Nebraska citizens.

## INDEPENDENT DETERMINATION

The majority has circumvented the question whether a pen register, in the absence of authorization by a valid warrant, violates a citizen's protection available under the Nebraska Constitution. While a court should not be asked to "hunt through a constitution in an effort to find language which might arguably support a challenger's position," location of the particular constitutional provision applicable in this case does not require some tiresome trek through the Nebraska Constitution, from article I, § 1 (a person's inalienable rights and a government from the consent of the governed), to article XVII, § 9 (Nebraska Constitution enrolled and deposited in the Secretary of State's office). The federal cases mentioned by the majority, namely, *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S. Ct. 364, 54 L. Ed. 2d 376 (1977), and *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979), involve a pen register in relation to the fourth amendment to the U.S. Constitution: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ," while the cited cases from state courts, *People v. Sporleder*, 666 P.2d 135 (Colo. 1983), and *Com. v. Beauford*, 327 Pa. Super. 253, 475 A.2d 783 (1984), answered the pen register question in reference to respective state constitutions which provided protection against "unreasonable searches and

seizures." The constitutional quarry of the "hunt" in Hinton's case is found at Neb. Const. art. I, § 7: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause . . . ," which is the exact constitutional protection examined in the above-indicated cases, federal and state. Therefore, as the result of Hinton's unquestionable reference to Neb. Const. art. I, § 7, this court should have resolved the issue about the pen register which produced information effective in Hinton's conviction.

Without question, a state may impose higher standards governing police practices on the basis of *state* law, and may guard individual rights, including the right to be free from unreasonable searches and seizures, more fervently than the U.S. Supreme Court does under the federal Constitution. *Mills v. Rogers*, 457 U.S. 291, 102 S. Ct. 2442, 73 L. Ed. 2d 16 (1982); *Oregon v. Hass*, 420 U.S. 714, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975); *State v. Havlat*, 222 Neb. 554, 385 N.W.2d 436 (1986). "[T]he substantive rights provided by the Federal Constitution define only a minimum," a floor rather than a ceiling. *Mills v. Rogers, supra* at 300. "The present function of state constitutions is as a second line of defense for those rights protected by the federal Constitution and as an independent source of supplemental rights unrecognized by federal law." *Developments in the Law—The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324, 1367 (1982). Although opinions from federal courts, deciding questions involving the U.S. Constitution as well as other federal law analogously applicable to questions of state law, may provide appropriate models for resolution of issues arising under state law, a state court should not automatically defer to federal decisions, but should critically examine federal decisions, make an independent analysis of state law issues to be resolved, and determine solutions under appropriate state law. See Dix, *Exclusionary Rule Issues as Matters of State Law*, 11 Am. J. Crim. L. 109, 148 (1983).

## PEN REGISTER

In *United States v. Caplan*, 255 F. Supp. 805, 807 (E.D. Mich. 1966), a pen register was characterized or described as

a device attached to a given telephone line usually at a central telephone office. A pulsation of the dial on the line to which the pen register is attached records on a paper tape dashes equal in number to the number dialed. The paper tape then becomes a permanent and complete record of outgoing numbers called on the particular line. With reference to incoming calls, the pen register records only a dash for each ring of the telephone but does not identify the number from which the incoming call originated. The pen register cuts off after the number is dialed on outgoing calls and after the ringing is concluded on incoming calls without determining whether the call is completed or the receiver is answered. There is neither recording nor monitoring of the conversation.

In *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979), a divided U.S. Supreme Court held that a pen register by a telephone company does not constitute a search, and the customer or subscriber assumed the risk of the company's disclosure to police, eliminating the expectation of privacy necessary for fourth amendment protection.

Criticizing the majority opinion in *Smith v. Maryland, supra,* LaFave makes the following observation:

Under *Smith*, the police may without any cause whatsoever and for whatever purpose they choose uncover private relationships with impunity merely because the telephone company might under *some* circumstances for *certain limited purposes* make a record of such relationships for the company's *own* use. Indeed, it is enough for the majority in *Smith* that the telephone company has the capacity to make a record of such relationships, even though the company has had the good sense not to offend its subscribers by making or keeping those records for no reason.

. . . .

. . . [I]t makes no sense to say that the telephone subscriber (any more than the tenant or hotel occupant) is fair game for unrestrained police scrutiny merely because he has surrendered some degree of his privacy for a limited purpose to those with whom he is doing business. As

Professor Amsterdam put it, "[t]he fact that our ordinary social intercourse, uncontrolled by government, imposes certain risks upon us hardly means that government is constitutionally unconstrained in adding to those risks." [Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 406 (1974).]

1 W. LaFave, Search and Seizure § 2.7(b) at 507-08 (2d ed. 1987).

In *Com. v. Beauford*, 327 Pa. Super. 253, 475 A.2d 783, 791 (1984), the Pennsylvania Superior Court commented:

If any law enforcement officer could, with or without probable cause or even reasonable suspicion, use a pen register on his own authority to record every number dialed by any citizen in Pennsylvania from a residential, business, or government phone, the pen register clearly could become a powerful weapon threatening invasion not only of the individual's intimate privacy, but also his political liberty, including his rights to associate, to express his views, and even to think in freedom.

Several state courts, construing their respective state constitutions, have concluded that a citizen has a right to be free from unreasonable search and seizure in the form of police installation or use of a pen register, obtained without a warrant issued on probable cause, to record telephone numbers dialed in privacy. See, *Com. v. Beauford, supra; People v. Sporleder*, 666 P.2d 135 (Colo. 1983); *People v. Blair*, 25 Cal. 3d 640, 602 P.2d 738, 159 Cal. Rptr. 818 (1979); *State v. Hunt*, 91 N.J. 338, 450 A.2d 952 (1982) (applied to toll billing records). In view of the vital role of telephonic communication in the private lives of Nebraska citizens, this court should have considered the constitutional question about police use of a pen register to obtain information otherwise beyond the control of the police, and should have required a warrant issued on probable cause as a condition precedent to acquisition of such pen register information.

## WIRETAP

The notion that the standards imposed by *state* law may be more restrictive than federal standards, and may exceed federal constitutional mandates or minimums, also applies to

requirements for a wiretap authorized under state law. See, *State v. Golter*, 216 Neb. 36, 342 N.W.2d 650 (1983); J. Carr, The Law of Electronic Surveillance, *Enactment and Constitutionality of Title III* (2d ed. 1987).

The case now before this court further illustrates how the "substantial compliance" doctrine has encouraged, and will continue to encourage, police noncompliance with wiretap statutes and court orders for electronic surveillance by law enforcement personnel. In Hinton's case, police routinely filed tardy interim reports or, worse yet, filed none at all, notwithstanding the court order for interim reports every 10 days after installation of the wiretap; persisted in the sloppy practice of late returns on search warrants; and filed the statutorily required wiretap inventory some 2 months after the 90-day period specified by statute. See Neb. Rev. Stat. § 86-705(9) (Reissue 1981).

The majority of this court feels that, inasmuch as interim progress reports on a wiretap are not required by the wiretap statute, failure to file progress reports, ordered by the court which authorized the wiretap, may be excused as a form of discretionary afterthought on the part of the authorizing court. Although § 86-705(7) provides that a court *may* require progress reports, that statute also contains a mandatory directive: "Such reports *shall be made* at such intervals as the judge may require." (Emphasis supplied.) If a court decides that progress reports are necessary to judicially determine whether a wiretap's objective has been achieved, thereby minimizing the intrusive nature of a wiretap, and then orders such progress reports from the police, rendition of progress reports is mandatory. Interim progress reports, when ordered by a court, and a wiretap inventory were intended by the Legislature to be substantial parts of the Nebraska wiretap law. In the wiretap statutes, as legislated requirements for a valid wiretap, nothing indicates a formula or factors by which one statutory component is accorded significance and value greater than any other part of the statutory scheme for wiretaps. On what basis and by what method a court may pick and choose among the several parts of the wiretap scheme to evaluate and characterize one part as more or less substantial than another

and, consequently, arrive at "substantial compliance" remains unexplained. See *United States v. Chavez*, 416 U.S. 562, 94 S. Ct. 1849, 40 L. Ed. 2d 380 (1974) (Douglas, J., dissenting in part).

While this court's majority believes that presence or absence of actual prejudice to Hinton is a consideration in evaluating police failure to file interim progress reports, a paramount consideration is the judicial role in monitoring police conduct in a wiretap. As we expressed in *State v. Golter, supra*: "The bedrock of our wiretap law is stringent judicial monitoring of law enforcement agencies seeking to use and using electronic surveillance—an investigative technique highly intrusive upon the privacy of the citizenry." 216 Neb. at 41, 342 N.W.2d at 653. Continued condonation of prosecutory or police indifference to, or ignorance of, Nebraska wiretap statutes and court orders pertaining to wiretaps leaves little inducement for law enforcement to obey the law. The doctrine of substantial compliance with wiretap statutes makes obedience to the law neither a virtue nor a duty in law enforcement. More important, by the doctrine of substantial compliance, the judicial role as a neutral monitor of a wiretap is relinquished to law enforcement, and efficiency in law enforcement, unrestrained by constitutional safeguards for citizens, becomes an absolute end in itself. Requiring strict compliance with wiretap statutes, however, will allay the concern contained in the "caveat" found in the majority's opinion.

The present case demonstrates that the substantial compliance doctrine only lessens law enforcement's incentive to adhere to the requirements of wiretap statutes. Dissenting in *Olmstead v. United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed. 944 (1928), Justice Brandeis warned:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizens. . . . Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

It remains to be seen what respect for law emerges from breach of law by those charged with enforcing laws.

Although the Nebraska wiretap statutes, as written, may be constitutional, the substantial compliance doctrine charts a course for inevitable collision with the constitutional protection against unreasonable search and seizure. While recognizing that police have departed from requirements imposed by the Nebraska wiretap statutes, this court's majority supplies no discernible demarcation to separate tolerable substantial compliance from a constabulary's contemptuous non-compliance condoned by the courts, and leaves one wondering when there is substantial compliance or not. Requiring the government's strict statutory compliance in wiretaps is but a small token to be paid for protection of privacy, lest nibbling at the wiretap statutes whets an appetite to devour constitutional safeguards against unreasonable search and seizure.

WHITE, J., joins in this dissent.