STATE OF NEBRASKA, APPELLEE, V. DANIEL STROHL, APPELLANT.
587 N.W. 2d 675

Filed January 8, 1999.    No. S-97-1250.

James R. Mowbray and Robin W. Hadfield, of Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

The present action involves Daniel Strohl's appeal from his conviction and sentence for criminal conspiracy to commit the

crime of escape and the crime of use of a deadly weapon during the commission of a felony. See Neb. Rev. Stat. § 28-202 (Reissue 1995). Strohl was found guilty and sentenced to a term of not less than 20 nor more than 30 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 1995). We affirm.

## I. FACTUAL BACKGROUND

In December 1996, Strohl was being held in the York County jail awaiting sentencing in relation to his conviction for first degree murder in the death of Pamela Kelly. Raymond Avila, Virginia Jarrell, and Denise Hanson were also incarcerated during this time period. Jarrell's cellmate was Hanson, and Strohl's cellmate was Avila. Even though Strohl and Jarrell were housed in separate cellblocks, their cells were directly adjacent to each other. Given the proximity of the cells, Strohl and Jarrell were able to speak to each other through openings in the jail doors where food trays were given to inmates.

On December 30, 1996, Strohl's cellmate, Avila, sent the York County sheriff, Dale Radcliff, a note asking to talk to him. Avila informed Radcliff that Strohl had arranged for his "girl-friend" to bring a weapon to the law library and that she was going to leave the weapon in the same location where she had been leaving cigarettes. In an attempt to verify Avila's statements, Radcliff and his deputy went to the law library to conduct a search and found two packs of cigarettes hidden behind various books. Radcliff reported the incident to the county attorney and then contacted the Nebraska State Patrol to have a surveillance camera installed in the library. Radcliff spoke with Avila again on December 30; Avila told Radcliff that Strohl had written a letter to "some woman." Radcliff went to the jail mail-room to verify what Avila had told him and retrieved an outgoing letter sent by Strohl addressed to Jarrell, who had been released from custody on December 15. Radcliff did not open the letter but merely photographed the envelope and allowed the letter to be mailed. The next day, Radcliff saw Jarrell enter the sheriff's office and hand an envelope to the dispatcher. Radcliff retrieved the envelope, opened it and photocopied the letter, and sent it on to Strohl. Based on the contents of the letter, Radcliff and two State Patrol officers again searched the library and

found additional cigarettes. That same day, Avila informed Radcliff that Strohl was going to meet with "this woman" during visitation the next day to arrange for a weapon to be brought to the law library.

Based on the information obtained from Avila and the evidence found in the law library, Radcliff had a microphone placed in the jail visiting room to intercept the face-to-face conversations between Strohl and Jarrell. The jail visiting rooms at the York County jail are concrete block, approximately 5 feet wide by 6 feet long on either side of a pane of glass that separates the visitor and the inmate. Below the glass is an area of approximately 6 to 8 inches which is solid except for a stainless steel grate in the middle. The microphone was placed in this stainless steel grate. The microphone receiver was placed in the sheriff's office, where it was monitored by a State Patrol drug investigator.

This procedure was followed four times. Because the sufficiency of the evidence is not at issue, we find it unnecessary to provide a factual recitation of the events that transpired after the initial interception. This court merely notes that the transcript of the intercepted communications reveals that an escape plan was being formulated.

On February 12, 1997, an information was filed against Strohl, charging him with criminal conspiracy to commit the crime of escape and the crime of use of a deadly weapon during the commission of a felony. Strohl filed an amended motion to suppress, seeking to exclude any intercepted oral communications or evidence derived from the allegedly illegal interception. Strohl argued the communications were intercepted in violation of Neb. Rev. Stat. § 86-701 et seq. (Reissue 1994 & Cum. Supp. 1996). The district court overruled the motion and determined the communications in question were not "oral communications" as defined by § 86-701(12), because neither Strohl nor Jarrell exhibited either an objective or a subjective expectation of privacy. Strohl also filed a motion for change of venue and argued the pretrial publicity regarding his prior murder conviction would effectively deny him his constitutional right to a fair trial. This motion was overruled, and the case proceeded to trial.

## II. ASSIGNMENTS OF ERROR

Strohl contends the district court erred in (1) failing to sustain his motion to suppress, because the jail visiting-room conversations were intercepted in violation of the Nebraska intercepted communications statutes, § 86-701 et seq.; (2) overruling his motion for a mistrial because the State failed to provide exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); (3) failing to sustain certain motions to strike, which in turn forced him to use peremptory challenges; (4) overruling his motion to change venue; and (5) imposing an excessive sentence which was predicated on the court's receipt of a letter from Kelly's family as part of the presentence report.

## III. STANDARD OF REVIEW

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996).

The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court and is subject to reversal only when clearly wrong. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998); *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995).

A motion for change of venue is addressed to the discretion of the trial judge and will not be disturbed absent an abuse of discretion. *State v. Jacob, supra.*

A sentence within statutory limits will not be disturbed on appeal absent an abuse of discretion. *State v. Hill*, 255 Neb. 173, 583 N.W.2d 20 (1998).

## IV. ANALYSIS

### 1. "ORAL COMMUNICATION"

In Strohl's first assignment of error, Strohl claims the district court erred in failing to sustain his motion to suppress, because

the jail visiting-room conversations were intercepted in violation of the Nebraska intercepted communications statutes, § 86-701 et seq.

In *State v. Hinton*, 226 Neb. 787, 794, 415 N.W.2d 138, 143 (1987), we stated that the Nebraska intercepted communications statutes make

> it unlawful to . . . deliberately intercept . . . through the use of any "electronic, mechanical, or other device," any . . . oral communications, unless the interceptor has previously obtained a court order permitting the interception or is a party to the communication, or one of the parties to the communication has previously consented to the interception.

In order for a statement to fall within the protection of these statutes, however, the conversation must first be determined to be an " 'oral communication.' " *State v. Weikle*, 239 Neb. 157, 159, 474 N.W.2d 486, 488 (1991). An oral communication is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . ." § 86-701(12). In *State v. Weikle, supra* (citing *United States v. McIntyre*, 582 F.2d 1221 (9th Cir. 1978)), we stated that for a statement to fall within the statute's definition, the communication must be uttered by a person (1) who has a subjective expectation of privacy and (2) whose expectation is objectively reasonable under the circumstances.

In *State v. Weikle*, 239 Neb. at 160, 474 N.W.2d at 489, we determined there is no reasonable expectation of privacy within the confines of a " 'jail cell.' " We cited with approval *In re Joseph A.*, 30 Cal. App. 3d 880, 106 Cal. Rptr. 729 (1973), for the proposition that there is no reasonable expectation of privacy as to oral communications within a "police station or jail facility." *State v. Weikle*, 239 Neb. at 161, 474 N.W.2d at 489. However, this court has never before been presented with the question of whether an inmate has a reasonable expectation of privacy in a face-to-face conversation in a "jail visiting room." Because the Nebraska intercepted communication statutes are patterned after title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. (1994), we look to

924

federal law in interpreting the provisions of the Nebraska intercepted communications statutes. See, *State v. Weikle, supra*; *State v. Hinton, supra.*

In *Lanza v. New York*, 370 U.S. 139, 82 S. Ct. 1218, 8 L. Ed. 2d 384 (1962), the U.S. Supreme Court addressed a situation where the police recorded a jail visiting-room conversation between Lanza and his jailed brother. Lanza later refused in a hearing before a legislative investigating committee to answer questions based on the secret recording. After upholding Lanza's conviction on independent grounds, the Supreme Court added that in any case, Lanza could not rely on the Fourth Amendment in refusing to answer the committee's questions, because the location of the recorded conversation, a jail visiting room, was not a protected area. The Court stated:

> [T]o say that a public jail is the equivalent of a man's "house" or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's "house," and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day. Though it may be assumed that even in jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection, there is no claimed violation of any such special relationship here.

370 U.S. at 143-44.

Similarly, in *People v. Santos*, 26 Cal. App. 3d 397, 102 Cal. Rptr. 678 (1972), the court determined that the federal wiretap statute was inapplicable to a jail visiting-room conversation,

because the parties did not have an expectation of privacy, i.e., the conversation was outside the definition of an "oral communication." In *Santos*, the defendant and his wife spoke on an intercom system in the jail visiting room. In an attempt to suppress the statement at trial, the defendant argued he intended to communicate with his wife in confidentiality; the court rejected this contention. On appeal, the defendant alleged the trial court erred in refusing to grant the motion to suppress, because the monitoring violated the federal wiretap law, 18 U.S.C. §§ 2510 through 2520. The court rejected this argument, stating that the conversation was outside the statutory definition of an "oral communication" because the defendant did not possess a subjective expectation of privacy, and that an expectation of privacy under such circumstances would have been unreasonable. The defendant further alleged the monitoring violated his 4th and 14th Amendment rights. The court rejected his argument, citing *Lanza, supra*, and stated that "[i]t has repeatedly been held . . . that electronic surveillance of conversations between jail inmates and their visitors does not transgress the constitutional prohibition against unreasonable searches and seizures." 26 Cal. App. 3d at 402, 102 Cal. Rptr. at 681. See, also, *People v. Von Villas*, 11 Cal. App. 4th 175, 15 Cal. Rptr. 2d 112 (1992) (holding that there is no expectation of privacy in jail visiting area and that federal wiretap statute does not apply in such situations); *People v. Blehm*, 44 Colo. App. 472, 623 P.2d 411 (1980) (holding that there is no right of privacy in jail visiting room conversations under Fourth Amendment or federal wiretap law).

However, in *Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), the Supreme Court declared that "the Fourth Amendment protects people, not places. What a person . . . seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Based on the holding in *Katz* and the fact that *Lanza v. New York*, 370 U.S. 139, 82 S. Ct. 1218, 8 L. Ed. 2d 384 (1962), epitomized the "protected areas" analysis, a few courts have intimated moving away from *Lanza*'s total rejection of privacy in favor of a position limiting eavesdropping to situations where a showing of institutional security has been made. See, e.g., *Bonner v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975), *cert. denied* 435 U.S.

932, 98 S. Ct. 1507, 55 L. Ed. 529 (1978); *Donaldson v. Super. Ct. of Los Angles Cty.*, 35 Cal. 3d 24, 672 P.2d 110, 196 Cal. Rptr. 704 (1983). The greater weight of authority, however, has consistently followed *Lanza* and upheld the admission of monitored conversations in police stations, jail visiting rooms, or jail cells. For instance, in *United States v. Paul*, 614 F.2d 115, 116 (6th Cir. 1980), the Sixth Circuit stated:

> It still appears to be good law that so far as the Fourth Amendment is concerned, jail officials are free to intercept conversations between a prisoner and a visitor. This was the ruling in *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962)[,] and it appears to have survived *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

See, e.g., *United States v. Hearst*, 563 F.2d 1331 (9th Cir. 1977), *cert. denied* 435 U.S. 1000, 98 S. Ct. 1656, 56 L. Ed. 2d 90; *Christman v. Skinner*, 468 F.2d 723 (2d Cir. 1972).

Strohl argues he had an expectation of privacy in the jail visiting room because the room is surrounded by concrete block walls; the room has steel doors which are closed during visitation; there are no intercoms or devices for jail staff to communicate with, listen to, or monitor conversations in the visiting room; and there is only a small window on the visitor's side of the room where jail staff can observe the inmate and visitor. The State concedes the evidence is divided as to whether Strohl exhibited a subjective expectation of privacy. However, the State argues that a subjective expectation of privacy is not enough; the expectation of privacy must also be objectively reasonable. We agree and so held in *State v. Weikle*, 239 Neb. 157, 474 N.W.2d 486 (1991).

We find the Fourth Amendment principle in *Lanza v. New York, supra*, and the holdings in *People v. Santos*, 26 Cal. App. 3d 397, 102 Cal. Rptr. 678 (1972); *People v. Von Villas, supra*; and *People v. Blehm, supra*, persuasive and conclude that Strohl's subjective expectation of privacy in his face-to-face conversations with Jarrell in the jail visiting room was not objectively reasonable under the circumstances. As such, the conversations were not oral communications protected under

§ 86-701 et seq. We therefore hold that the district court's decision to overrule the motion to suppress was correct.

### 2. FAILURE TO PROVIDE EXCULPATORY EVIDENCE

In Strohl's second assignment of error, Strohl claims the district court erred in overruling his motion for a mistrial based on the prosecution's failure to provide exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Strohl's argument centers on a series of statements made by Hanson regarding her ability to obtain a gun for Jarrell.

From December 4, 1996, to April 7, 1997, Hanson was incarcerated in the York County jail and for at least part of this time was a cellmate of Jarrell's. During their incarceration together, Jarrell asked Hanson to help her get Strohl out of jail. After Jarrell was released, she came to visit Hanson in jail. Jarrell asked Hanson if she could obtain a gun for her from her boyfriend. Hanson initially stated in a pretrial deposition that she never talked to her boyfriend about obtaining a gun for Jarrell. During trial, however, Hanson recanted and admitted writing a letter to her boyfriend about obtaining a gun.

The recantation occurred during cross-examination on the fourth day of trial. Defense counsel asked Hanson whether she talked to her boyfriend about obtaining a gun, and Hanson responded, "I told you guys I didn't, but I did. I didn't want to get him in trouble." Upon further cross-examination, Hanson stated that she had informed the prosecution of the inconsistency on Monday, the first day of trial. Hanson stated that after she informed the prosecution of the inconsistency, the prosecution "told me to explain it in Court and that's what I'm doing." Strohl's attorney moved for a mistrial. The district court denied the motion but granted the defense's request for further cross-examination on the subject. Strohl claims he was prejudiced by not being informed until the fourth day of trial that Hanson had recanted, when the prosecution was aware of the discrepancy 4 days prior.

In *Brady v. Maryland*, 373 U.S. at 87, the Supreme Court held that "the suppression by the prosecution of evidence favor-

able to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), the Court disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes. The Court further noted that regardless of request, favorable evidence is "material," and constitutional error results from its suppression by the government "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result in the proceeding would have been different." 473 U.S. at 682. See, e.g., *Calderon v. Thompson*, 523 U.S. 538, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998); *Wood v. Bartholomew*, 516 U.S. 1, 116 S. Ct. 7, 133 L. Ed. 2d 1 (1995). In *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), the Court clarified the *Bagley* materiality standard and stated that a " 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' "

The difficulty this court has with Strohl's contention is that *Brady* applies only to "favorable" evidence. See *United States v. Bagley*, 473 U.S. at 675 (stating that "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused"). The Eighth Circuit emphasized this point in *U.S. v. Flores-Mireles*, 112 F.3d 337, 339 (8th Cir. 1997), where the court held that under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), "[t]here is no duty to disclose evidence that is . . . inculpatory . . . ." Several other federal circuits have ruled in a similar fashion. See, e.g., *U.S. v. Arias-Villanueva*, 998 F.2d 1491, 1506 (9th Cir. 1993) (holding that *Brady* does not apply to evidence which "tends to inculpate, not exculpate"); *U.S. v. Polland*, 994 F.2d 1262, 1267 (7th Cir. 1993) (holding that *Brady* does not apply to evidence "which is more inculpatory than exculpatory"). Moreover, in *U.S. v. Willis*, 997 F.2d 407 (8th Cir. 1993), the Eighth Circuit also ruled that *Brady* does not apply to inculpatory evidence even if the evidence contains a few seemingly inconsistent statements which defendant could have further used to impeach the witness.

In *U.S. v. Willis*, Steve Ettles, Charles Hopp, and Steven C. Willis were indicted on federal bank fraud charges. On appeal, Willis claimed a *Brady* violation had occurred in that the government failed to turn over FBI routine investigation reports concerning conversations that agents had with Ettles. Willis' claim arose from statements made by FBI agents at Ettles' sentencing hearing. In response to a question by the prosecutor concerning one of Ettles' objections to his presentence report, the agent stated that Ettles had told him during an interview that Willis had come up with the idea for one of the bank fraud schemes, but that Ettles admitted discussing the idea with his two partners. The Eighth Circuit rejected Willis' *Brady* violation claim, saying:

> This statement shows that Ettles directly inculpated, rather than exculpated, Willis. Accordingly, even if the [FBI routine investigation reports] contained a few seemingly inconsistent statements with which Willis could have further impeached Ettles, we are confident that the reports as a whole were not material under *Bagley* because they directly inculpated Willis. Willis has failed to show how these reports undermine confidence in the trial's outcome.

997 F.2d at 414.

The same is true in the case at bar. Strohl's defense against the conspiracy charge was that the escape plan was never serious and there was never an overt act in furtherance of the escape. To support this argument, the defense was using Hanson's statements that she never contacted her boyfriend. However, Hanson's recantation undermined the defense's theory. The evidence that Hanson contacted her boyfriend about securing a gun demonstrates that Jarrell was serious about obtaining a weapon in furtherance of the escape and that the plan was moving forward. As such, the evidence of Hanson's recantation served to inculpate rather than exculpate Strohl. Therefore, the evidence of Hanson's recantation could not be considered material under *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), and the district court was correct in overruling Strohl's motion for mistrial.

### 3. MOTIONS TO STRIKE MEMBERS OF VENIRE

In Strohl's third assignment of error, Strohl claims the district court erred in failing to sustain certain motions to strike, which in turn forced him to use peremptory challenges.

The record shows that several members of the general venire admitted reading newspaper articles regarding Strohl's prior murder conviction. The voir dire transcript reveals that 19 of the original 29 venirepersons had heard or read something regarding this case or the prior case. During voir dire, the defense moved to strike 10 of 29 venirepersons for cause. The district court sustained three of those challenges and denied the other seven. Strohl complains the district court erred in overruling these seven motions to strike, which in turn forced him to use his peremptory challenges.

The law does not require that a juror be totally ignorant of the facts and issues; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based on the evidence. *State v. Lotter, ante* p. 456, 586 N.W.2d 591 (1998); *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998). The competency of a juror is generally presumed, and the burden is on the challenging party to establish otherwise. *State v. Jacob, supra*; *State v. Rice*, 231 Neb. 202, 435 N.W.2d 889 (1989). The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court and is subject to reversal only when clearly wrong. *State v. Lotter, supra*; *State v. Jacob, supra*; *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995).

Even though the record reveals that several venirepersons possessed knowledge of Strohl's prior conviction, the record, taken as a whole, adequately demonstrates that each juror either had formed no opinion regarding Strohl's guilt or innocence or could set aside any opinions and decide the case based on the evidence. We therefore find the district court did not abuse its discretion in denying Strohl's motions to strike.

Strohl's additional complaint that the district court's failure to sustain his motions to strike denied him due process by forcing him to use peremptory challenges is without merit. In *Ross v. Oklahoma*, 487 U.S. 81, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988), the Court explained that whether the wrongful denial of a challenge for cause violates due process because a peremptory

challenge must be used to eliminate that venireperson is a question for each state court. In *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990), we stated that in any event, there can be no question whether a challenge for cause has been wrongfully denied if the denial was not erroneous. Because the district court did not abuse its discretion in denying the motions to strike, this argument is meritless. See *id.*

### 4. MOTION TO CHANGE VENUE

In Strohl's fourth assignment of error, Strohl claims the district court erred in overruling his motion to change venue. In essence, Strohl claims that the pretrial publicity regarding the murder of Kelly made it impossible for him to receive a fair trial in his present case.

To warrant a change of venue due to pretrial publicity, mere exposure to news accounts of a crime does not presumptively deprive a criminal defendant of due process. *State v. Jacob, supra.* Rather, to warrant a change of venue a defendant must show the existence of pervasive misleading pretrial publicity. *Id.*; *State v. McHenry, supra*; Neb. Rev. Stat. § 29-1301 (Reissue 1995). A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *State v. McHenry, supra.* A trial court abuses its discretion in denying a motion to change venue where a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair and impartial jury. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. McHenry, supra*; *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993).

A number of factors must be evaluated in determining whether the defendant has met the burden of showing that pretrial publicity has made it impossible to secure a fair trial and impartial jury. These factors include (1) the nature of the publicity, (2) the degree to which the publicity has circulated throughout the community, (3) the degree to which the publicity circulated in areas to which venue could be changed, (4) the length of time between the dissemination of the publicity complained of and the date of the trial, (5) the care exercised and ease encountered in the selection of the jury, (6) the number of

challenges exercised during voir dire, (7) the severity of the offenses charged, and (8) the size of the area from which the venire was drawn. *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Bowen, supra*; *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993).

The crux of Strohl's argument is that the pretrial publicity regarding his prior murder conviction made it impossible to receive a fair trial in his present case. However, as discussed earlier, the law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions and render a verdict based upon the evidence presented in court. *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); *State v. Bradley, supra*.

Strohl concedes that venirepersons were asked whether they could put aside their knowledge and follow the court's instructions, and many said they could. Strohl contends, however, that the level of their knowledge regarding his earlier murder conviction and the unique circumstances of the case required that the trial be moved to another county or that a jury from another county be seated in York County. In support of this contention, Strohl introduced three newspaper articles dated December 22, 1995; May 11, 1996; and January 31, 1997. Based on these articles, Strohl argues that the length of time between the dissemination of the publicity complained of (January 1997) and the date of jury selection (September 1997), 8 months, was "a relatively short time frame." Brief for appellant at 26. We disagree.

This court has repeatedly held that news accounts appearing within a time period less than 8 months before trial could not serve as a basis for a change of venue. See, e.g., *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990) (ruling that abuse of discretion did not occur where only five newspaper articles appeared within 4 months of jury selection); *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992) (ruling that news coverage was too distant where the most recent article appeared within 3 months of trial). Moreover, Strohl failed to show how the articles actually prejudiced him. In *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998), we stated that mere exposure to news accounts does not presumptively deprive a

defendant of due process; rather, there must be a showing of pervasive misleading pretrial publicity. Strohl has made no such showing.

In addition, the nature of the publicity does not support Strohl's contention. The December article included nothing more than a factual recitation of the events, describing the murder victim, how she was found, and a chronological narrative leading to Strohl's apprehension. The May article merely contained a story about the victim's mother, and the January article simply discussed how Pamela Kelly died and highlighted Strohl's apparent remorse. We have consistently held that press coverage which is factual in nature cannot serve as the basis for change of venue. *State v. Williams, supra; State v. Bradley, supra.* See, also, *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990) (stating that news accounts which are factual and do not reveal hostility or animosity to defendant do not serve as factual basis for change of venue); *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987) (stating that factual news accounts reporting occurrence of crime, one defendant's call for ambulance, charging of defendants, and appointment of special prosecutor did not furnish basis for change of venue). The content of the publicity further undermines Strohl's claim, considering the fact that the articles were unrelated to his present charge for conspiracy to escape but pertained only to his prior murder conviction.

Strohl also alleges that the sheer time which voir dire took to complete, approximately 5 hours, indicates the jury panel was prejudiced. However, in other cases where voir dire took a similar or longer time to conduct, we did not find a change of venue was warranted. See, *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992) (4 hours); *State v. Jacobs, supra* (1 day); *State v. Ell*, 196 Neb. 800, 808, 246 N.W.2d 594, 599 (1976) ("2 full days").

Finally, Strohl argues that venue should have been changed because the trial court denied his request for leave to question four additional individuals out of the presence of the other venirepersons. However, we have stated that except where there is a showing that without sequestration a party's rights would be prejudiced, a party has no right to examine venirepersons out of the presence of all other venirepersons. *State v. Thompson*, 244

Neb. 375, 507 N.W.2d 253 (1993). Strohl has shown no prejudice. In *State v. Bradley*, 236 Neb. at 387, 461 N.W.2d at 537, the defendant argued that he was unable to ask the " 'searching questions' " required under the circumstances, just as Strohl now argues. We found the record in *Bradley* to be "replete with questions regarding pretrial publicity and whether such publicity had caused anyone to form an opinion as to Bradley's guilt or innocence." *Id.* at 387, 461 N.W.2d at 537. We also find the record in Strohl's case replete with questions regarding the effects of pretrial publicity.

Based on our review of the record, the voir dire transcript, and all the pertinent factors, we cannot say that the trial court abused its discretion in denying the change of venue.

### 5. INCLUSION OF LETTER FROM KELLY'S FAMILY IN PRESENTENCE REPORT

In Strohl's final assignment of error, Strohl claims the district court erred by imposing an excessive sentence predicated on the court's receipt of a letter from Kelly's family as part of the presentence report.

A sentence imposed within statutory limits will not be disturbed upon appeal absent an abuse of discretion. *State v. Hill*, 255 Neb. 173, 583 N.W.2d 20 (1998); *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998); *State v. Chojolan*, 253 Neb. 591, 571 N.W.2d 621 (1997). As the district court's sentence was within the statutory limit, see §§ 28-202 and 28-105(1), our inquiry is limited to reviewing for an abuse of discretion.

An abuse of discretion occurs when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result. *State v. Hill, supra*; *State v. Pattno, supra*; *State v. Chojolan, supra*. In this regard, the sentencing phase is separate and apart from the trial phase, and the traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence. *State v. Ryan*, 248 Neb. 405, 534 N.W.2d 766 (1995). Additionally, a sentencing court has broad discretion as to the source and type of evidence and information that may be used in determining the kind and extent of the punishment to be imposed. *Id.* In

*State v. Rose*, 183 Neb. 809, 811, 164 N.W.2d 646, 648 (1969), we stated:

> Highly relevant, if not essential, to [a judge's] determination of an appropriate sentence is the gaining of knowledge concerning the defendant's life, *character*, and *previous conduct*. In gaining this information, the trial court may consider reports of probation officers, police reports, affidavits, and other information including [the judge's] own observations of the defendant.

(Emphasis supplied.)

The letter contained information regarding Strohl's prior murder conviction and a request by Kelly's family that Strohl receive the maximum sentence available for the charge of conspiracy to escape. We determine the letter from Kelly's family members is relevant to Strohl's "character" and his "previous conduct." We further determine that the district court did not abuse its discretion by including the letter in the presentence report and that the sentence imposed was not excessive.

## V. CONCLUSION

Having considered all of the defendant's assignments of error, we affirm the district court's order in all respects.

AFFIRMED.