Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/04/2018 08:10 AM CDT

State of Nebraska, appellee, v.
Michael A. Nolt, appellant.
___ N.W.2d ___

Filed February 9, 2018.    No. S-17-073.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.

3. **Effectiveness of Counsel: Appeal and Error.** Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.

4. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

5. **Search and Seizure: Search Warrants.** In the absence of a clear showing of prejudice, the failure to comply strictly with postservice statutory requirements will not invalidate a search conducted pursuant to an otherwise valid warrant.

6. ____: ____. A failure in the ministerial act of returning and filing a search warrant does not void the warrant.

7. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's representation fell below an objective standard of reasonableness and, but for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial.

8. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

9. **Trial: Effectiveness of Counsel: Evidence: Appeal and Error.** An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.

10. **Due Process: Police Officers and Sheriffs: Identification Procedures.** Due process concerns arise when law enforcement officers use unnecessarily suggestive means to procure an identification.

11. **Police Officers and Sheriffs: Identification Procedures: Pretrial Procedure.** Even when the police use unnecessarily suggestive means to procure an identification, the suppression of the resulting identification is not the inevitable consequence. Instead, the trial judge must screen the evidence for reliability pretrial.

12. ____: ____: ____. Identification evidence must be screened for reliability pretrial whenever it is obtained via unnecessarily suggestive procedures arranged by law enforcement officers.

13. **Rules of Evidence: Hearsay.** For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant under the stress of the event.

14. **Rules of Evidence: Hearsay: Proof.** The key requirement to the excited utterance exception is spontaneity, which requires a showing that the statements were made without time for conscious reflection.

15. **Rules of Evidence: Hearsay.** An excited utterance does not have to be contemporaneous with the exciting event. It may be subsequent to the event if there was not time for the exciting influence to lose its sway. The true test is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event.

16. ____: ____. Facts relevant to whether a statement is an excited utterance include the declarant's manifestation of stress, the declarant's physical condition, and whether the declarant spoke in response to questioning.

17. **Rules of Evidence: Hearsay: Police Officers and Sheriffs.** Statements made in response to questions from law enforcement in particular do not generally have inherent guarantees of reliability and trustworthiness. But the declarant's answer to a question may still be an excited utterance if the context shows that the statement was made without conscious reflection.

18. **Search and Seizure: Police Officers and Sheriffs: Evidence: Proof.** Under the inevitable discovery doctrine, evidence obtained without a valid warrant is nonetheless admissible if the State shows by a preponderance of the evidence that the police would have obtained the disputed evidence by proper police investigation entirely independent of the illegal investigative conduct.

19. **Constitutional Law: Search and Seizure.** For purposes of the Fourth Amendment, a search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

20. ____: ____. For purposes of the Fourth Amendment, a seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

21. ____: ____. As a general rule, a person has no reasonable expectation of privacy in places readily accessible to the public.

22. **Trial: Attorneys at Law: Effectiveness of Counsel: Appeal and Error.** When reviewing a claim of ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics, and an appellate court will not second-guess reasonable strategic decisions by counsel.

23. **Effectiveness of Counsel: Presumptions.** When considering whether trial counsel's performance was deficient, there is a strong presumption that counsel acted reasonably.

Appeal from the District Court for Douglas County: Timothy P. Burns, Judge. Affirmed.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Kelch, J.

## I. NATURE OF CASE

After a jury trial, Michael A. Nolt was convicted of first degree murder, manslaughter, two counts of use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Nolt appeals his convictions, alleging that evidence obtained pursuant to an alleged invalid warrant should have been excluded. Nolt also alleges three ineffective assistance of counsel claims.

## II. FACTS

At around 2:11 a.m., on October 10, 2015, Omaha police received a report of a shooting at a residence in the northwest precinct of Omaha, Nebraska. After knocking and receiving no response, police entered the residence and immediately discovered the motionless, wounded body of Aurelius Hassell lying on the couch with his sweatpants pulled down to his knees. They then heard a female voice coming from down the hallway and found Tommynique Valentine, who advised them that she had been shot in the leg. In another bedroom, six children were found unharmed. Officers then asked Valentine if there was anyone else in the house, and she told them about another victim, Malquan King, in a bedroom closet. When an officer went to check on King, he was motionless and not breathing. King and Hassell were later pronounced dead. In connection with the shooting, Nolt was charged with first degree murder, attempted murder, and use of a firearm to commit a felony, among other charges.

At trial, the State called a number of witnesses. Valentine testified about the events that occurred at her house on the night of the shootings, and officers testified about the investigation that followed. The State also introduced redacted versions of telephone calls that Nolt made to his mother while in jail. After the State rested, Nolt testified in his own defense.

### 1. Night of Shootings

At trial, Valentine testified about the events that occurred at her house the night of the shootings. She testified that at the

time of the incident, she was in a relationship with King. King was coming back to Omaha after traveling with his friend, Hassell, and another man whom Valentine had never met. According to Valentine, King had referred to this latter person as his "'white homeboy.'"

Valentine and King had planned for King to stay the night at Valentine's house that night. Valentine had been in contact with him before she fell asleep around 10 p.m. on October 9, 2015. At approximately 2 a.m., the next day, she awoke to the sound of the doorbell. King, Hassell, and the white male were outside, and a white Chevrolet Impala was parked in the driveway. Valentine let King and Hassell into the house, and they talked in the front room for a few minutes before Hassell went back outside. Hassell then came back in and asked if the white male could use the bathroom. Valentine said, "Sure."

According to Valentine, she walked back to her bedroom with King while Hassell stayed in the front room. Valentine testified that Hassell was sitting on the couch and was "on his phone." When Valentine got to her bedroom, she discovered her 3-year-old daughter was asleep on the bed, so she picked her daughter up and carried her to a bedroom where other children were sleeping. As Valentine carried her daughter down the hall, she crossed paths with the white male who was on his way to the bathroom. The white male nodded his head, and Valentine said, "[H]ello."

Valentine testified that she got "a good look" at the white male. She described him as "clean cut" and wearing glasses, a white long-sleeved dress shirt, khaki pants, and black dress shoes.

While Valentine was putting her daughter to bed, King got ready for bed. According to Valentine, King had taken off his clothes and placed them in her hamper. (The clothes were later found folded on the bed.) Valentine sat on the bed and waited for the white male and Hassell to leave so that she could turn off the lights and lock her door.

A moment later, the bathroom door opened and Valentine heard "pop, pop, popping sounds." Unsure of what the sound

was, she told King to go check it out. Instead, King asked Valentine if she had a gun. Valentine then became worried, and she went and hid in her closet. King was on his way to hide in the closet with Valentine when Valentine heard louder popping noises and saw King's face change. King had been shot.

Valentine did not see the shooter, but heard the sound of dress shoes walking away down the hall. She then heard more shots fired. Next, Valentine heard the sound of dress shoes walking back to the bedroom and heard a voice say, "Talk to me, Talk to me. Are you okay?" Valentine did not make a sound. After that, additional shots were fired and Valentine was struck in the leg. Valentine then heard the sound of shoes again and heard the front door open and close. After she heard the front door close, Valentine came out of the closet, grabbed her cell phone from the nightstand, and went back into the closet to call the 911 emergency dispatch service.

Valentine was taken to a hospital for treatment. As she was being transported to an ambulance, she saw that the white Impala was gone.

## 2. Investigation

Omaha police officers testified at trial about the investigation that followed the shootings. When officers arrived at the scene, they found Hassell deceased in the living room and King deceased in the bedroom. They also found a number of gun shells throughout the house. Photographs of the scene were entered into evidence.

The photographs show Hassell lying on the couch with his feet on the floor and his hands curled up near his face. One cell phone was on the ground between Hassell's feet, and another one was on the couch. King was found lying just inside Valentine's bedroom closet. Two cell phones were found in the bedroom, one on the bed and one on the ground near the bedroom door.

King's cell phone contained information that eventually led police to Nolt. From King's cell phone, a detective in the

digital forensics unit was able to retrieve photographs and the
Global Positioning System (GPS) coordinates of where the
photographs were taken. One of the photographs was a "selfie"
of King—a photograph King had taken of himself, a week
before his death. Nolt was in the background. From the GPS
coordinates imbedded in the photograph's file, the detective
determined that the photograph was taken at a hotel in Fort
Wayne, Indiana. An officer investigating the case contacted
the hotel's manager. The officer asked the manager if either
King or Hassell had rented a room there. The manager indi-
cated that neither had. Later, however, the manager called the
officer back to provide further information that she felt might
be relevant to their investigation, including Nolt's name. The
manager also provided officers with still photographs from
the hotel's surveillance video showing Nolt talking to front
desk staff.

Nolt was featured in another photograph on King's cell
phone. The GPS information imbedded in that photograph
indicated that it was taken 1 week before King's death at a car
rental company in Fort Wayne.

As part of their investigation, officers spoke to a couple of
King's friends. One of these friends, Alejandro Luna, testified
at trial that Nolt was traveling with King and Hassell because
they could not get a rental car in their name, but Nolt got one
for them in his name.

After police learned Nolt's name and other details about the
rental vehicle from the car rental company, they sought and
received a search warrant for OnStar Corporation (OnStar),
which services GPS devices in vehicles, to provide the rental
car's GPS data to police. The Impala was tracked to a residence
in Mesa, Arizona. Information regarding the case was relayed
to Mesa police, and a local task force went to the residence.
Members of the task force saw Nolt and another male leave
the residence in the Impala, and they followed the two men to
a nearby discount department store. Nolt went into the store
and purchased .40-caliber ammunition. After Nolt returned to

the Impala, the task force took Nolt into custody in the store parking lot.

Later that day, police executed a search warrant at the Mesa residence. They found a black duffelbag containing items belonging to Nolt, including an Indiana driver's license, an Arizona identification card, and a .40-caliber Smith & Wesson handgun, the same caliber of firearm used to kill King and Hassell.

Nolt's cell phone records were also subpoenaed as part of the investigation. An officer who analyzed the records testified that the records show that Nolt placed a call from Walnut, Iowa, at 3:14 a.m., approximately 1 hour after the shooting. Later that morning, another call was placed from Kansas City, and at 6:30 p.m., in the Denver, Colorado, area. The next day calls were made from Santa Fe and Albuquerque, New Mexico, and Phoenix, Arizona.

## 3. JAIL CALLS

The State offered as exhibits recordings of three telephone calls Nolt made to his mother while in jail. Redacted versions of the recordings were admitted into evidence.

In the first call, Nolt and his mother were discussing where his glasses were. His mother told him that the detective told her that they did not have Nolt's glasses. Nolt told her, "They got all my glasses." He told her that one pair of glasses was "wherever the gun was at" and that "[m]y glasses were in my suitcase."

In the second call, Nolt told his mother, "Hey, you know what some guys were saying?" He said, "they say, 'You were one shot away,'" and he laughed. His mother asked him, "What's that mean?" Nolt replied that "[Valentine] should have been killed, too." Nolt laughed again. Then his mother laughed and said, "You know I said the same thing? I said . . . 'Your aim ain't very good, is it?' Didn't you have your glasses on you . . . ?" Nolt and his mother laughed. His mother said, "Right?" Nolt laughed again and said, "Oh, I don't know anything about what you're talking about." They both laughed again.

In the third call, Nolt told his mother, "[Valentine] was so mad at me, you would think I killed her boyfriend or something." Nolt then laughed.

### 4. Nolt's Testimony

Nolt ultimately testified that he shot King and Hassell in self-defense.

Nolt testified that a couple of weeks before the incident in Omaha, King, Hassell, and Luna were shot at outside of an apartment building by "a tall black guy." At that time, Hassell was shot in the buttocks.

Nolt also testified about the days leading up to the shooting in Omaha. He testified that he, King, and Hassell were traveling together and that they had gone to Kansas City to pick up some of Hassell's property and then to Omaha to see King's girlfriend, Valentine.

Nolt then testified about the events that occurred at Valentine's house on the night of the shootings. He testified that when they arrived at Valentine's house, he asked to go inside and use the bathroom. When he went inside, he saw Hassell sitting on the couch in the living room with a gun and a bag of marijuana out. According to Nolt, after he returned to the living room from using the bathroom, he told Hassell that he was leaving and asked for the car keys. Nolt claimed Hassell then said, "no, you ain't going anywhere" and grabbed his gun, so Nolt "fired on him." Nolt testified that he then heard King asking for a gun, so he went to the bedroom and shot King as well. When he returned to the living room, Hassell "jump[ed] at" Nolt and Nolt fired the gun again. Afterward, Nolt drove to Arizona to stay with a friend, and on the way, he threw Hassell's gun away at a rest stop.

Nolt testified that to get money in Arizona, he sold the property that Hassell had picked up in Kansas City, along with some video games that King had stolen a few days before the shooting. On cross-examination, Nolt testified that he knew Hassell carried a lot of cash on him.

5. Verdicts and Sentences

The jury convicted Nolt of first degree murder for the killing of King, manslaughter for the killing of Hassell, two counts of use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. He was acquitted on the charges related to the shooting of Valentine. He was sentenced to life in prison for King's murder, to 45 to 50 years' imprisonment for use of a deadly weapon to commit a felony, to 18 to 20 years' imprisonment for the manslaughter of Hassell, to 18 to 20 years' imprisonment for use of a deadly weapon to commit a felony, and to 45 to 50 years' imprisonment for possession of a deadly weapon by a prohibited person. All five of Nolt's sentences were to be served consecutively, resulting in an aggregate sentence of life imprisonment plus 126 to 140 years' imprisonment.

Additional facts are set forth below as they are relevant for analyzing the issues presented.

III. ASSIGNMENTS OF ERROR

Nolt assigns that the district court erred when it permitted the State to introduce evidence derived from the warrant for Nolt's GPS data. Nolt also assigns that his trial counsel was ineffective for failing to object to an officer's hearsay statement, failing to move to suppress Valentine's in-court identification, and failing to "adequately investigate and present several aspects of Nolt's defense." Finally, Nolt assigns that the cumulative effect of the ineffective assistance provided by trial counsel deprived Nolt of his constitutional right to a fair trial.

IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of

law that an appellate court reviews independently of the trial court's determination.[1]

[2] Statutory interpretation presents a question of law, which we review independently of the lower court's determination.[2]

[3] Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact.[3] When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.[4] With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*,[5] an appellate court reviews such legal determinations independently of the lower court's decision.[6]

## V. ANALYSIS

Before delving into the assignments of error, we note that the State claims Nolt waived all error regarding the evidence that established Nolt as the shooter because Nolt himself testified that he was the shooter. Nolt, on the other hand, argues that such evidence should not have been admitted and that the error forced him to abandon a misidentification theory of defense and instead testify to support a self-defense theory. Nolt claims that if the evidence in question was not admitted, his misidentification theory would have remained a viable defense, and that he would not have testified, which would have resulted in a reasonable probability of a different outcome in his case.

[4] Because the case is resolvable without deciding this issue, we decline to address the State's argument. An appellate

---

[1] *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017).

[2] *State v. Smith*, 286 Neb. 77, 834 N.W.2d 799 (2013).

[3] *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013).

[4] *Id.*

[5] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[6] *State v. Rocha, supra* note 3.

court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[7]

### 1. Validity of OnStar Warrant

Nolt first assigns that the district court erred in permitting the State to introduce evidence derived from a warrant that Nolt claims is invalid. Before analyzing Nolt's claim, we set forth additional facts relevant to the issue presented.

### (a) Additional Facts

Prior to trial, Nolt filed a motion to suppress any and all evidence derived from the Onstar search. This evidence includes property found during the search of the Impala and the search of the residence in Mesa. In the motion, Nolt alleged that the Onstar search was unlawful under the Fourth Amendment, because it was not authorized by a valid warrant.

Nolt claims that the warrant was invalid, because the officer who obtained the warrant failed to comply with the following statutory requirements:

(1) The warrant must be executed and returned within ten days after its date. The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property or shall leave the copy and the receipt at the place from which the property was taken. . . . The inventory shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property was taken if they are present, or in the presence of at least one credible witness other than the applicant for the warrant or the person from whose possession or premises the property was taken, and shall be verified by the officer. The judge or magistrate shall deliver a copy of the inventory upon request to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

---

[7] *State v. Huston, ante* p. 323, 903 N.W.2d 907 (2017).

(2) The return and inventory required by subsection (1) of this section may be submitted to the magistrate or judge in person or by facsimile or other electronic means.[8]

The officer who obtained the warrant for OnStar gave a copy to a deputy U.S. marshal for service with OnStar. After that, the officer placed the original warrant in his desk drawer and did not return it until July 19, 2016, after an attorney for the State contacted him about it. When asked why he did not return it sooner, the officer stated, "I didn't realize I had to. I didn't look at it like a regular search warrant because I wasn't looking for property. And then on top of that, we're extremely busy. And once it was in my desk drawer, I honestly forgot about it."

After the hearing, the district court found that the fact that the warrant was not returned within 10 days was purely a ministerial defect and did not negate the validity of the warrant. Therefore, it determined that the OnStar search was conducted pursuant to a valid warrant and thus denied Nolt's motion to suppress the evidence derived from the OnStar search.

(b) Analysis

On appeal, Nolt argues that the district court erred in denying his motion to suppress. The State argues that suppression is not a remedy for the violation of § 29-815. It argues that the officer's failure to return the warrant within the time limit provided by § 29-815 was purely a ministerial defect and that such errors do not render a warrant invalid. In this instance, we agree.

[5,6] We have previously stated that in the absence of a clear showing of prejudice, the failure to comply strictly with postservice statutory requirements will not invalidate a search conducted pursuant to an otherwise valid warrant.[9] We have specifically stated that "a failure in the ministerial

---

[8] Neb. Rev. Stat. § 29-815 (Reissue 2016).

[9] *State v. Hinton*, 226 Neb. 787, 415 N.W.2d 138 (1987); *State v. McCown*, 189 Neb. 495, 203 N.W.2d 445 (1973).

act of returning and filing a search warrant does not void the warrant."[10] Thus, here, where there is no clear showing of prejudice, the officer's failure to return the warrant did not invalidate it.

In his reply brief, Nolt argues that although ministerial defects do not *typically* render a warrant invalid, such defects should render a warrant invalid when the police deliberately and intentionally disregard the ministerial rule, citing *State v. Moore*.[11] Nolt argues that the officer deliberately and intentionally disregarded § 29-815. We note that it is unclear whether Nolt made this argument to the trial court. His brief in support of his motion to suppress is not made a part of the record, and the trial court did not explicitly address that argument.

Regardless, we find that *Moore* does not apply to this case. In *Moore*, the Nebraska Court of Appeals was considering whether a violation of a procedural rule regarding nighttime searches invalidated a search, whereas here we were are dealing with a postservice statutory requirement, which is ministerial in nature.

Because the officer's failure to timely return the warrant was a ministerial defect that did not prejudice Nolt's trial, the failure to timely return it did not invalidate it, and Nolt's first assignment of error is without merit.

## 2. Ineffective Assistance of Counsel Claims

[7] Nolt next asserts three claims of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's representation fell below an objective standard of reasonableness and, but for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different.[12]

---

[10] *State v. Hinton*, 226 Neb. at 800, 415 N.W.2d at 146.

[11] *State v. Moore*, 2 Neb. App. 206, 508 N.W.2d 305 (1993).

[12] See *Strickland v. Washington, supra* note 5.

A "reasonable probability is a probability sufficient to under-mine confidence in the outcome [of the trial]."[13]

[8,9] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[14] The determining factor is whether the record is sufficient to adequately review the question.[15] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.[16] We conclude that the record is sufficient to address all of Nolt's ineffective assistance claims.

### (a) Failure to Move to Suppress Valentine's In-Court Identification of Nolt

Nolt assigns that his trial counsel was ineffective because he failed to move to suppress Valentine's in-court identification of Nolt. Nolt argues that Valentine's in-court identification should not have been admitted because it was corrupted by improper police conduct occurring after Valentine identified Nolt in a photographic lineup.

### (i) Additional Facts

Prior to trial, no motion was made to suppress Valentine's in-court identification of Nolt. At trial, Valentine was asked to identify the white male that was in her house on October 10, 2015, and she indicated it was Nolt.

On cross-examination, Valentine was asked about her out-of-court identification of Nolt. The State objected to that line of questioning, and during a sidebar, counsel for Nolt explained that he was trying to show that Valentine's in-court identi-fication was unreliable because of police misconduct occur-ring after her out-of-court identification of Nolt. Counsel for

---

[13] *Id.*, 466 U.S. at 694.

[14] *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

[15] *Id.*

[16] *Id.*

Nolt represented to the court that a photographic lineup was done by one officer and that when another officer came in, Valentine asked him how she did. That officer allegedly stated, "Well, I'm not allowed to say, but by the way, as a result of your identification, we're going to arrest somebody." The State's objection to the line of questioning was overruled, and defense counsel was allowed to question Valentine about statements made after the out-of-court identification. The following exchange occurred:

> Q. . . . [D]id you inquire of that second officer, How'd I do?
>
> A. I wouldn't say I said that [sic] exact words.
>
> Q. You wanted to know if you were correct?
>
> A. I knew I was correct. I just . . .
>
> Q. Did you ask, Was I correct?
>
> A. I don't recall.
>
> Q. Do you recall him telling you, I'm not supposed to tell you that?
>
> A. I recall him saying we can't discuss, or something of that nature. I don't know the specifics. That's over a year ago.
>
> Q. Okay. Do you recall him saying even though he's not supposed to discuss specifics, he then discussed someone being arrested?
>
> A. No. Because I didn't . . .
>
> Q. Okay. Nothing further on that subject.

### (ii) Analysis

To prevail on this claim of ineffective assistance of counsel, Nolt must show that the failure to move to suppress Valentine's in-court identification fell below an objective standard of reasonableness and that if such motion had been made, a reasonable probability exists that the result of the trial would have been different.[17] However, if the motion would not

---

[17] See *Strickland v. Washington, supra* note 5.

have been granted, then it cannot be said that trial counsel's performance was deficient or that the result of the trial would have been different. Thus, we first consider whether a motion to suppress would have been successful.

[10,11] Due process concerns arise when law enforcement officers use unnecessarily suggestive means to procure an identification.[18] But, even when the police use such a procedure, the U.S. Supreme Court has indicated that suppression of the resulting identification is not the inevitable consequence.[19] Instead, the trial judge must screen the evidence for reliability pretrial.

Here, Nolt argues that a pretrial hearing would have revealed that Valentine's in-court identification was too unreliable to be admissible. The State, on the other hand, argues that a pretrial hearing was not required because the in-court identification was not arranged by law enforcement. We agree with the State.

[12] Identification evidence must be screened for reliability pretrial whenever it is obtained via unnecessarily suggestive procedures arranged by law enforcement officers. Here, Nolt is not arguing that law enforcement arranged an unnecessarily suggestive pretrial photographic lineup or in-court identification. Instead, he argues that improper police conduct occurring after the first identification procedure tainted Valentine's in-court identification. We are unaware of, and Nolt does not cite, any authority that requires a pretrial reliability screening in this situation. Instead, in such a case, we think it is the role of the jury, not the judge, to determine the reliability of such evidence, and it suffices to challenge reliability at trial through the mechanisms designed for that purpose, including cross-examination of the witness

---

[18] See *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012).

[19] *Id.*

making the identification.[20] And that is exactly what Nolt's counsel did.

Even assuming that the district court would have conducted a pretrial hearing on the reliability of Valentine's in-court identification, the identification would only be suppressed if it was "'so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"[21] In *Manson v. Brathwaite*,[22] the U.S. Supreme Court explained that "reliability is the linchpin in determining the admissibility of identification testimony." It set forth the following reliability factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."[23] The Court explained that these factors are to be weighed against "the corrupting effect of the suggestive identification itself."[24]

Based on the above factors, we conclude that the indicia of reliability outweigh any alleged corrupting influence. Valentine testified that she got "a good look" at Nolt on the night of the shootings. She was able to describe in detail what Nolt was wearing that night. From a photographic lineup, Valentine positively identified Nolt as the man who was in her house the night of the shooting. At trial, Valentine appeared confident in both that identification and her in-court identification of him. When asked if Nolt looked the same at trial as

---

[20] See *id.*, 565 U.S. at 248 (holding that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement").

[21] *Id.*, 565 U.S. at 238.

[22] *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

[23] *Id.*

[24] *Id.*

he did on the night of the shooting, Valentine testified that he
had gained weight, but his facial features were the same. And
importantly, Valentine had already positively identified Nolt in
the photographic lineup before the alleged unnecessarily sug-
gestive comment.

Because Valentine's in-court identification was sufficiently
reliable, any pretrial motion to suppress such identification
would have been futile. Therefore, Nolt's trial counsel was not
ineffective for failing to move to suppress the identification,
and Nolt's assignment of error is without merit.

### (b) Failure to Object to
### Hearsay Statement

Nolt also argues that his trial counsel was ineffective because
he failed to object to an inadmissible hearsay statement, i.e.,
Valentine's statement to an officer describing the shooter.
Before analyzing this claim, we set forth additional facts rel-
evant to the issue.

### (i) Additional Facts

Officer Corey Gorden was one of the officers who responded
to Valentine's call. He rode on the ambulance with her and
asked her questions on the way to the hospital. At trial, Gorden
testified that when he asked Valentine who shot her, she
described the person as a "nerdy, white male . . . with brown-
ish blonde hair wearing a white dress shirt, tan pants, and dress
shoes." No objection was made to the statement.

On appeal, Nolt argues that his trial counsel was ineffec-
tive for failing to object to the above statement as hearsay.
The State argues that trial counsel was not ineffective for not
objecting because the statement is admissible under the excited
utterance exception to the hearsay rule. Relevant to that excep-
tion, Gorden was asked about how Valentine appeared to him
during the ambulance ride. Gorden responded, "Emotional.
She had tears in her eyes and she was — seemed scared but
still somewhat calm." When asked what he meant by "calm,"
Gorden stated that Valentine's voice was not escalated, her

breathing was not labored, and she was "coherent to the . . .
questions [she was asked]."

*(ii) Analysis*

[13,14] The parties agree that Valentine's statement con-
stituted hearsay, but disagree as to whether the excited utter-
ance exception applies. For a statement to qualify as an
excited utterance, the following criteria must be established:
(1) There must have been a startling event, (2) the statement
must relate to the event, and (3) the statement must have
been made by the declarant under the stress of the event.[25]
The key requirement is spontaneity, which requires a show-
ing that the statements were made without time for conscious
reflection.[26]

Here, the startling event was the shooting, and Valentine's
statement related to the shooting because it described the
shooter. Thus, the issue is whether Valentine's statement was
made under the stress of the shooting.

[15-17] An excited utterance does not have to be contem-
poraneous with the exciting event.[27] It may be subsequent to
the event if there was not time for the exciting influence to
lose its sway.[28] The true test is not when the exclamation was
made but whether, under all the circumstances, the declar-
ant was still speaking under the stress of nervous excitement
and shock caused by the event.[29] Relevant facts include the
declarant's manifestation of stress, such as "'yelling,'" and the
declarant's physical condition.[30] Also relevant is whether the
declarant spoke in response to questioning.[31] Statements made

---

[25] *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993).

[26] *Id.*

[27] *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015).

[28] *Id.*

[29] *Id.*

[30] *Id.* at 79, 858 N.W.2d at 550.

[31] *State v. Hale, supra* note 27.

in response to questions from law enforcement in particular do not generally have inherent guarantees of reliability and trustworthiness.[32] But the declarant's answer to a question may still be an excited utterance if the context shows that the statement was made without conscious reflection.[33]

Based on the circumstances presented in this case, including Gorden's observations of Valentine while she was in the ambulance, we conclude that Valentine's statement was made under the stress of the startling event. Before Valentine herself was shot, she saw King's face when he was shot. Further, Valentine was in the house while the gun was fired multiple times, littering the house with gun shells. When questioned, Valentine was in an ambulance on her way to the hospital with a gunshot wound and facing an unknown medical outcome. Although Valentine's statement was made in response to questions from law enforcement, and despite her maintaining sufficient composure to answer the questions, we find that she was still under the stress of being shot and the stress of viewing another person being shot. Thus, we find that Valentine's statement was made without conscious reflection and that the excited utterance exception does apply. Therefore, Nolt's assignment of error is without merit.

### (c) Failure to Investigate and Present Certain Aspects of Nolt's Defense

Nolt also asserts that his trial counsel was ineffective because he failed to "adequately investigate and present several aspects of Nolt's defense." Nolt sets forth the following list of "trial counsel's [alleged] failures":

- Trial counsel failed to elicit Nolt's testimony that, in the last hour of the drive between Kansas City and Omaha on October 10, 2015, Hassell and King discussed murdering Nolt and burying him in the Nevada desert

---

[32] *Id.*

[33] *Id.*

while they believed Nolt was asleep in the back seat of
the vehicle;

- Trial counsel failed to formally compel either the State
or OnStar to produce an email purportedly sent from
OnStar to law enforcement pertaining to the GPS data
obtained by law enforcement, which prejudiced Nolt
because law enforcement officers engaged in illegal
behavior when obtaining said GPS data, including rep-
resentations to OnStar of having a search warrant before
it was issued by the lower court;

- Trial counsel failed to formally compel either the State
or the . . . car rental company to divulge all com-
munications, particularly those in which law enforce-
ment obtained, and [the car rental company] revealed,
the Vehicle Identification Number (VIN) for the 2015
Chevrolet Impala at issue during trial. Such commu-
nications would have revealed that law enforcement
officers engaged in illegal behavior when obtaining
said VIN and other information from [the car rental
company].[34]

### (i) Failure to Compel OnStar Emails

We first address Nolt's claim that his trial counsel was inef-
fective for failing to compel the State or OnStar to produce
certain emails. Although Nolt does not explain how the OnStar
emails would have benefited him at trial, we presume, as does
the State, that Nolt's claim is that it would have revealed that
the GPS search was premature and illegal. The State argues
that even if such was true, the GPS evidence would have
still been admissible under the inevitable discovery doctrine.
We agree.

[18] Under the inevitable discovery doctrine, evidence
obtained without a valid warrant is nonetheless admissible if
the State shows by a preponderance of the evidence that the

---

[34] Brief for appellant at 28-29.

police would have obtained the disputed evidence by proper
police investigation entirely independent of the illegal inves-
tigative conduct.[35] Here, the GPS data was obtained the same
day that the warrant was issued. Thus, even if the GPS data
was obtained *before* the warrant was issued, the police would
have obtained the same evidence pursuant to the warrant that
was issued. Accordingly, the GPS evidence would still have
been admissible and the result of the trial the same.

### (ii) Communications With Car Rental Company Regarding Impala

We also conclude that the result of the trial would have been
the same if Nolt's trial counsel had moved to compel the State
or the car rental company to disclose their communications.
Although Nolt fails to explain how the communications would
have benefited him at trial, we presume, as does the State, that
Nolt's claim is that the communications would have revealed
that the information obtained about the Impala, namely the
vehicle identification number (VIN), were obtained via an ille-
gal search and seizure. However, as the State points out, a war-
rant was not needed because the police communication with
the car rental company was not a search and obtaining the VIN
was not a seizure for Fourth Amendment purposes.

[19-21] The Fourth Amendment to the U.S. Constitution
protects individuals against unreasonable searches and seizures
by the government.[36] A "'search [for Fourth Amendment pur-
poses] occurs when the government violates a subjective expec-
tation of privacy that society recognizes as reasonable,'"[37] and

---

[35] See *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006). See, also, State
*v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992) (holding that fruits
of search were properly admitted because if defendant would not have
consented, then affidavit would have been completed and search warrant
obtained to perform the same search).

[36] See *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016).

[37] *Id.* at 695, 884 N.W.2d at 439 (citing *Kyllo v. United States*, 533 U.S. 27,
121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001)).

a "'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."[38] Here, Nolt could not have had an expectation of privacy with regard to the police communication with the car rental company, because there is no evidence that it agreed to keep any information about Nolt's rental car confidential and no evidence that confidentiality is typical in such situations. Furthermore, Nolt had no possessory interest in the VIN of the Impala. The car rental company owned the car and was free to convey information about it to police. Moreover, as a general rule, a person has no reasonable expectation of privacy in places readily accessible to the public,[39] and federal law requires that the VIN be placed in the plain view of someone outside the automobile.[40] Fourth Amendment protections were not invoked by the car rental company's voluntarily providing the VIN to police. Thus, a warrant was not required, and Nolt's trial counsel was not ineffective for failing to move to compel the State or the car rental company to disclose their communications.

We note that to the extent that Nolt had an expectation of privacy or possessory interest in the contents or location of the Impala, no Fourth Amendment violation occurred because police obtained a warrant for both the GPS search and the subsequent seizure of the Impala in Arizona.

### (iii) King and Hassell's Alleged
### Discussion of Murdering Nolt

Finally, Nolt argues that his counsel was ineffective for failing to elicit Nolt's testimony regarding an alleged conversation between King and Hassell about their plan to murder

---

[38] *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).

[39] See *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection").

[40] *New York v. Class*, 475 U.S. 106, 106 S. Ct. 960, 89 L. Ed. 2d 81 (1986).

Nolt. Nolt argues that the conversation contributed to the circumstances surrounding his decision to use deadly force and that the introduction of such evidence would have bolstered his self-defense theory.

[22,23] When reviewing a claim of ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics, and an appellate court will not second-guess reasonable strategic decisions by counsel.[41] When considering whether trial counsel's performance was deficient, there is a strong presumption that counsel acted reasonably.[42] The presumption can be rebutted without an evidentiary hearing only when a decision by counsel cannot be justified as a result of a plausible trial strategy.[43]

We conclude that it is plausible that Nolt's counsel decided to not elicit testimony about the alleged conversation in order to save Nolt's credibility. While it is conceivable that evidence of the alleged conversation might have helped the jury understand why Nolt would be quick to think that Hassell was reaching for a gun to harm him, the same evidence also serves to undermine Nolt's credibility. As pointed out by the State, if the jury had been presented with evidence that King and Hassell had discussed their plans to kill Nolt in Nolt's presence, then the jury might wonder why Nolt did not try to escape to safety when he was outside Valentine's house by himself.

Nolt's argument would have more merit if the district court had not instructed the jury on Nolt's claim of self-defense. But here, the court instructed the jury on self-defense and the jury apparently disbelieved Nolt's testimony because it found him guilty.

Because any benefit provided by evidence of the alleged conversation would be negated by the blow to Nolt's credibility, we conclude that it is plausible that Nolt's counsel did

---

[41] See *State v. Nesbitt*, 279 Neb. 355, 777 N.W.2d 821 (2010).

[42] *Id.*

[43] *State v. Brown*, 268 Neb. 943, 689 N.W.2d 347 (2004).

not elicit testimony about the alleged conversation for this reason. Thus, Nolt's trial counsel was not ineffective for failing to adduce this evidence, and Nolt's assignment of error is without merit.

### 3. CUMULATIVE ERROR

Finally, Nolt alleges that the cumulative effect of the ineffective assistance of trial counsel deprived Nolt of his constitutional right to a fair trial. But, as explained above, we found no merit to any of Nolt's ineffective assistance of counsel claims. Thus, the alleged errors could not have been cumulative, and Nolt's last assignment of error is without merit.

### VI. CONCLUSION

For the foregoing reasons, Nolt's assignments of error are without merit, and the judgment of the district court is affirmed.

AFFIRMED.

WRIGHT, J., not participating.